658 A.2d 1122

**Christopher John ALBRECHT**

v.

**STATE of Maryland.**

**No. 1122, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

May 31, 1995.

46

Byron L. Warnken, Baltimore, and Gary L. Crawford (Clarke, Crawford & Bonifant, on the brief), Gaithersburg (Roger W. Galvin, on the brief, Washington, DC.), for appellant.

Tarra DeShields–Minnis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Argued before MOYLAN, FISCHER and DAVIS, JJ.

MOYLAN, Judge.

Although of only peripheral concern in the initial appellate reviews of this case, a number of unresolved—and vexing—

issues involving the law of reckless endangerment now command our central focus as we revisit the case.

The appellant, Christopher J. Albrecht, who was a Montgomery County police officer at the time of the crime, was convicted in the Circuit Court for Montgomery County by Judge Peter J. Messitte, sitting without a jury, of one count of involuntary manslaughter and two separate counts of reckless endangerment.

The first count of the indictment charged the appellant with the unlawful manslaughter of Rebecca Garnett. After a lengthy and hard-fought trial, Judge Messitte found that the evidence did not persuade him that Officer Albrecht had intentionally fired the shotgun blast that caused Ms. Garnett's death. Accordingly, he found the appellant not guilty of voluntary manslaughter. Judge Messitte did find, however, that Officer Albrecht's behavior in pointing and handling the weapon was grossly negligent in that it represented a gross deviation from the standard of conduct expected of a reasonable police officer. Accordingly, he found the appellant guilty of involuntary manslaughter of the gross negligence variety.

The second count of the indictment charged the appellant with the reckless endangerment of Rebecca Garnett. Based on the same "gross negligence," so defined (perhaps inadvertently) in the Maryland case law as to embrace the quality of "recklessness," Judge Messitte also found the appellant guilty of the reckless endangerment of Rebecca Garnett. He merged that conviction, however, into the conviction for manslaughter.

The third count of the indictment initially charged the appellant with the reckless endangerment of "other person(s) present on Larchmont Terrace." At the end of the State's case, the third count was amended, over the appellant's objection, by substituting for "other person(s) present on Larchmont Terrace" the names of seven specific persons, to wit, Officer Marvin Thomas, Darnell Budd, Iris Frazier, Tequila Frazier, James Littlejohn, Carroll Walker, and Travell Dumar. Judge Messitte ultimately found the appellant not guilty of the

reckless endangerment of Officer Marvin Thomas, Darnell Budd, and Iris Frazier. He found, on the other hand, that the appellant was guilty of having recklessly endangered Tequila Frazier, James Littlejohn, Carroll Walker, and Travell Dumar. Discriminating factors, considerations other than the undeviating factor of the appellant's gross negligence, obviously came into play in separating the four who were recklessly endangered from the three who were not. For the conviction on that third count, Judge Messitte sentenced the appellant to one year in prison, to be served consecutively with the sentence for manslaughter, but then suspended that sentence.

In appealing his convictions to this Court, the appellant challenged the legal sufficiency of the evidence to support the finding of gross negligence that was the indispensable predicate for both the manslaughter conviction and the reckless endangerment convictions. He also challenged the reckless endangerment convictions in a number of other regards. He claimed that he was the victim of multiplicity in pleading, in that the State had twice charged him (in the second *and* third counts) with the single crime of reckless endangerment. He claimed, moreover, that the third count as initially drawn did not adequately charge an offense for the failure to name any victim.

The appellant claimed alternatively that if, contrary to his urging, the unit of prosecution in reckless endangerment were held to be each individual person recklessly endangered, the third count was then ultimately duplicitous, charging him with seven offenses in a single count and convicting him of four. He claimed that the amendment naming those seven victims, over his objection, was impermissibly one of substance and not merely of form. He also challenged the legal sufficiency of the evidence to support the reckless endangerment convictions with respect to Tequila Frazier, James Littlejohn, Carroll Walker, and Travell Dumar in various regards.

In reversing the appellant's convictions in *Albrecht v. State,* 97 Md.App. 630, 632 A.2d 163 (1993), our focus was narrow. We held that the evidence was not legally sufficient to permit

a finding of gross negligence. On the basis of both Montgomery County Police Academy instruction and the testimony of numerous Montgomery County officers, the evidence did not permit a finding that in the circumstances of the present case Officer Albrecht was guilty of a gross and wanton deviation from permitted police conduct in the unlimbering, the loading, and the aiming of his weapon.

In reversing this Court's decision, the Court of Appeals in *State v. Albrecht,* 336 Md. 475, 649 A.2d 336 (1994), was correspondingly narrow in its focus. In exposing the Achilles' Heel of this Court's analysis, it looked to one small, but crucial, additional factor in the officer's conduct that had been overlooked by us. After having unlimbered, loaded, and aimed his weapon, the officer moved his finger from the safer position of the trigger guard to the more exposed position of the trigger itself, thereby increasing, if not creating, the danger that even a nervous twitch or an uncontrollable muscular spasm might cause the weapon to fire accidentally. The police academy instruction and the testimony of fellow officers that had legitimized as acceptable practice every step leading up to that final one stopped short of legitimizing the placing of the finger on the trigger itself. The Court of Appeals held that that small but officially uncountenanced incremental risk was sufficient to permit a finding that the officer had been grossly negligent.

### The Unresolved Issues

In reversing the convictions on the basis of the appellant's primary contention, we found it unnecessary to deal with the appellant's secondary contentions touching on the law of reckless endangerment. In reversing our decision on the primary issue, the Court of Appeals had no occasion to address those secondary issues. On remand from the Court of Appeals, it is now incumbent upon us to turn our attention to what was heretofore of only marginal concern—some of the still unresolved nuances of reckless endangerment law and the significance of those nuances to the contentions that are now back before us.

In first addressing this case, we found it unnecessary to assess the legal sufficiency of the evidence to support the reckless endangerment convictions with respect to any element of the crime other than that of whether the appellant's conduct permitted a finding of an *unjustified* creation on his part of a substantial risk of death or serious injury to another. Holding as we did that the appellant's conduct could not be found to have been unjustified, we had no need to demarcate any possible geographic arc of danger or to determine what the evidence showed with respect to whether any of the persons named in the third count were actually within that arc of danger at the time the danger was still operational:

> Holding as we do that the evidence was not legally sufficient to support the convictions for reckless endangerment because of the insubstantiality of the "risk" factor based upon the mere aiming of the shotgun and not the firing of the shotgun, it is unnecessary to examine further the question of what victims might otherwise have been recklessly endangered. The record, however, is highly dubious in that regard.

*Albrecht v. State,* 97 Md.App. at 684 n. 3, 632 A.2d 163.

We were similarly content to leave for another day the question of what is the appropriate unit of prosecution when it comes to the crime of reckless endangerment. Consequently, we were able to put off the alternative pleading problems attendant on the resolution of that issue as to the appropriate module of criminality:

> Our holding that the evidence was not legally sufficient in terms of establishing the "risk" factor itself relieves us of the burden of addressing a very nettlesome pleading problem. That is the problem of computing the units of prosecution with respect to the crime of reckless endangerment.
>
> . . . . .
>
> If it is the life-endangering act itself that is the unit of prosecution and not each victim thereby endangered, then the second and third counts, each charging reckless endan-

germent, should not both have been in this case. One of them would have been redundant.

If, on the other hand, the unit of prosecution is each endangered victim rather than the mere act itself, then the third count in this case would present numerous problems. The naming or otherwise identifying of the victim would be a critical element. Permitting the State at the end of the State's case to amend the third count by adding for the first time the names of victims, where theretofore none had been named, would seem to represent an amendment going to actual substance and not to mere form.

97 Md.App. at 685–86 n. 4, 632 A.2d 163.

If we had been correct in our holding that the evidence could not support a finding that the appellant's creation of the risk was unjustified, then it was immaterial whether one person or a hundred persons had been subjected to what was a justified risk. Accordingly, there was no occasion for us to address the possible duplicity of the third count:

There would be an additional problem of how seven crimes against seven victims could be charged in a single count. What would be the double jeopardy implications, for instance, if following, *arguendo*, the granting of a judgment of acquittal with respect to three victims, the overturning of the convictions of two more on the ground that the evidence was not legally sufficient, and the overturning of the convictions of the other two on some mere evidentiary ground, that count with respect to those two final victims was remanded for possible retrial? Fortunately, none of these problems is before us in this case and we intimate no answers with respect to them. The law of reckless endangerment is still relatively unplowed ground.

97 Md.App. at 686 n. 4, 632 A.2d 163.

All of these issues are now very much alive.

### The Factual Background

In *State v. Albrecht*, 336 Md. at 479–82, 649 A.2d 336, Judge Raker fully and articulately summarized the circumstances

that immediately preceded the fatal shooting of Rebecca Garnett:

The basic facts of this case are undisputed. On the afternoon of May 23, 1991, Montgomery County Police Officers Christopher Albrecht and Marvin Thomas were dispatched to Fairhaven Drive in Gaithersburg, Maryland, to investigate a reported stabbing. Upon arriving at the scene, the officers were informed that a fight had broken out between Timothy Fair and three young men and that Fair had been stabbed in the back with a broken bottle by Darnell Budd, whom Albrecht knew by name. Witnesses at the scene also told the officers that the three men involved in the fight were known to be drug dealers and that the three might have been involved in a robbery. The officers were told that Budd had left the Fairhaven Drive area in a green Chevrolet driven by Rebecca Garnett. One witness warned the officers that there might be a gun in the Chevrolet, although no one at the scene reported seeing any of the individuals involved with a gun.

While the officers were still at the scene, a witness saw the green Chevrolet pass by and shouted "There goes the car." Albrecht saw three people in the car as it passed: a female, who was driving, and two black male passengers. Thomas and Albrecht both got into their cruisers and set off in pursuit. Although the officers initially lost sight of the Chevrolet, after a brief search of the surrounding neighborhood Albrecht spotted the car in a parking lot at Larchmont Terrace, a townhouse complex in Montgomery County. The car was parked perpendicular to the curb with the front end facing the street. The driver, Rebecca Garnett, and one of the male passengers, whom Albrecht recognized as Darnell Budd, had exited the car and were standing in the parking lot. The other male passenger, James Littlejohn, remained in the back seat of the car. The car was parked directly in front of a neighborhood playground. The documentary evidence presented at trial showed the Garnett stood no more than six feet from the sidewalk that ran in front of the playground area. In photographs from the scene, some

playground equipment, including a slide, is visible directly behind the spot where Rebecca Garnett stood. A swingset is visible to the rear and the right of where Garnett stood. Both the slide and swingset appear to be set approximately ten to fifteen feet behind the sidewalk. At the time that Albrecht spotted the Chevrolet—which was approximately 7 p.m.—it was still daylight and there were several children and adults both in the playground area, on the sidewalk running behind the Chevrolet and in front of the playground, and on the surrounding street.

Albrecht brought his police cruiser to a stop in front of and to the right of the driver's door of the Chevrolet. At that time, Garnett was standing next to the closed driver's side door, holding a bag of Frito's in one hand. Her other hand was empty. Budd stood by the passenger side door. Littlejohn, still in the car, appeared to be either sitting on the back seat or kneeling down on the floorboards of the car's rear passenger compartment. As Albrecht was parking his cruiser, he saw Garnett and Budd exchange words and begin to move towards the Chevrolet, appearing to him as if they were going to try to leave the scene. Exiting his cruiser, Albrecht yelled, "Stop! Freeze!" and, at the same time, removed his shotgun from its rack inside his vehicle. Witnesses at the scene reported also hearing a command to "Put your hands in the air." Albrecht, standing behind the open door of his cruiser, then immediately placed a shotgun shell in the chamber of the shotgun and "racked" the shotgun into its final stage of firing capability. He then leveled his shotgun at Garnett, who stood approximately thirty-seven feet away from him. Witnesses at the scene testified that Albrecht, looking down the barrel of the gun, aimed his shotgun directly at Garnett.

Officer Thomas arrived at Larchmont Terrace a matter of seconds after Albrecht. Thomas moved his police cruiser into a position in front of and to the left of the Chevrolet. The manner in which Albrecht and Thomas parked their cruisers was in accordance with standard police procedure by which officers use their vehicles for cover while attempt-

ing to effectuate an arrest. When Thomas first exited his cruiser, he did not remove his shotgun from its rack inside his vehicle. Upon hearing the racking of Albrecht's shotgun, however, Thomas reached back into his cruiser and removed his own. Both Thomas and Albrecht were using Remington Wingmaster Model 870 shotguns, the standard model shotgun issued to Montgomery County police officers. As manufactured, the shotgun holds four rounds of ammunition. Albrecht, however, had customized his weapon by fitting it with a bandolier, or sling, that held fifteen extra rounds of ammunition and added 2.39 pounds to the weight of his weapon.

Albrecht testified that he kept his shotgun pointed at Garnett until he decided that she did not pose any danger to him or to any other person. After "checking off" Garnett as a threat, Albrecht testified that he intended to swing the shotgun to the left in order to bring it to bear on Littlejohn and Budd. The shotgun, however, discharged and struck Garnett in the chest. Garnett died almost immediately. Witnesses at the scene testified that Albrecht was steadily holding the shotgun and directly aiming it at Garnett at the time that the weapon discharged.

Although Albrecht saw Garnett sink to the ground after his gun had fired, he testified that he thought that she was simply sitting down so as to comply with his orders to "stop" and "freeze" and that he did not realize that she had been shot. Shouting "I told you not to move," Albrecht immediately racked a second round into the shotgun's chamber as a result, Albrecht testified, of "realizing my gun went off." He and Thomas then approached the Chevrolet and placed Budd and Littlejohn under arrest. After Budd and Littlejohn had been arrested, Albrecht turned his attention to Garnett. (Footnote omitted.)

### *The Pleading Problem: Multiplicity or Duplicity?*

Absent some third theory that we cannot even imagine, the unit of prosecution in a reckless endangerment case has to be either 1) the reckless act of the defendant creating a substan-

tial danger of harm or 2) each person endangered by such reckless act. Whichever way that issue is resolved, the State has a pleading problem.

If the unit of prosecution is the reckless act itself, there is a single crime whether one person or a hundred persons are endangered by that act. Although it would be indispensable that at least one human being be recklessly endangered, the identification of a particular victim or victims would be surplusage. In the context of this case, the second and third counts of the indictment would have charged the appellant with precisely the same crime. Such multiplicious charging would be erroneous *per se* and the multiple conviction under the redundant third count would have to be reversed.

W.R. LaFave & J.H. Israel, 2 *Criminal Procedure* (1984), § 19.2(e) at 457–58, discusses the problem of the multiplicious charge:

> A multiplicious indictment charges a single offense in several counts.... The principle danger in multiplicity is that the defendant will receive multiple sentences for a single offense, although courts have noted that multiple counts may also work against defendant by leading the jury to believe that defendant's conduct is especially serious because it constitutes more than one crime. Multiplicity does not require dismissal of the indictment. The court may respond to a successful objection by requiring the prosecutor to elect one count, consolidating the various counts, or simply advising the jury that only one offense is charged. If the objection is first raised after conviction, the defendant will be entitled to relief from an improperly imposed multiple sentence ... (Footnotes omitted.)

*And see Brown v. State*, 311 Md. 426, 432 n. 5, 535 A.2d 485 (1988).

The reversal would be based on a double jeopardy problem of the *autrefois convict* variety guarding against the danger of multiple punishment for a single offense. Self-evidently, a retrial on the multiplicious count would be barred.

If, on the other hand, the unit of prosecution is each individual person who has been recklessly endangered, the indictment in this case was not multiplicious. There would be no reason why the appellant could not have been convicted of the reckless endangerment of Rebecca Garnett under the second count and also have been convicted of the separate crime of recklessly endangering some other person under the third count. In terms of the amended indictment in this case, however, the State might simply be jumping from the frying pan into the fire, exchanging the error of multiplicious charging for the error of duplicitous charging.

W.R. LaFave & J.H. Israel, 2 *Criminal Procedure* (1984), § 19.2(e) at 457, discusses the problem of the duplicitous charge:

> Duplicity is the charging of separate offenses in a single count. This practice is unacceptable because it prevents the jury from deciding guilt or innocence on each offense separately and may make it difficult to determine whether the conviction rested on only one of the offenses or both. Duplicity can result in prejudice to the defendant in the shaping of evidentiary rulings, in producing a conviction on less than a unanimous verdict as to each separate offense, in sentencing, in limiting review on appeal, and in exposing the defendant to double jeopardy. Duplicity usually occurs because of prosecutor error in assuming that a particular statute creates a single offense ... rather than several offenses. (Footnotes omitted.)

If the conviction on the third count were to be based on a holding that the count was duplicitous, a retrial on a charge or charges properly pleaded would not necessarily be barred. The issue, thus, is squarely before us of what is the appropriate unit of prosecution for the crime of reckless endangerment?

### The Unit of Prosecution

The crime of Reckless Endangerment is new in Maryland. It was enacted by Ch. 460 of the Acts of 1989. *See Minor v.*

*State*, 85 Md.App. 305, 313–15, 583 A.2d 1102 (1991) and *Minor v. State*, 326 Md. 436, 605 A.2d 138 (1992). It is codified in Md.Ann. Code art. 27 § 120 (1992), which provides in pertinent part:

(a) Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

■ For the reasons that follow, we hold that the unit of prosecution for the crime of Reckless Endangerment is each person who is recklessly exposed to the substantial risk of death or serious physical injury. Before immersing ourselves in the minutiae of the case law, it behooves us for a moment to stand on the mountaintop and look down on the larger field of the criminal law in perspective, for sometimes insight is permitted us in macrocosm that is not always suffered us in microcosm. It is with the benefit of this larger perspective that the academic writers perceptively group crimes into such categories as crimes against property, crimes against habitation, crimes against public morals, and crimes against persons. Although in actuality a particular crime may overlap several of these categories, the accepted categorization nonetheless serves to capture the essential nature of a criminal prohibition.

In this sense, the crime of Reckless Endangerment is quintessentially a crime against persons. It is an inchoate crime and is intended to deal with the situation in which a victim is put at substantial risk of death or serious bodily harm but may, through a stroke of good fortune, be spared the consummated harm itself. By identifying the consummated crime or crimes to which a particular inchoate crime is incipient, we are better able to appreciate the essential character and the basic purpose of the inchoate crime itself.

In *Williams v. State*, 100 Md.App. 468, 480–490, 641 A.2d 990 (1994), we analyzed at length the inchoate nature of

reckless endangerment and identified the various forms of criminal homicide and battery, intended and unintended, to which reckless endangerment was inchoate. We observed:

> As with all inchoate crimes, reckless endangerment was intended to plug a gap in the law. Inchoate crimes are designed to inhibit criminal conduct before it goes too far or to punish criminal conduct even when, luckily, it misfires. Reckless endangerment is, indeed, doubly inchoate. At the *actus reus* level, it is one element short of consummated harm. At the *mens rea* level, it is one element short of the specific intent necessary for either an attempt or for one of the aggravated assaults.

100 Md.App. at 481, 641 A.2d 990.

Confining ourselves to that side of the ledger where there has been no intent to inflict harm on anyone, the consummated crimes that could, with a stroke of bad fortune, eventuate from a reckless endangerment are several. Should the harm that is risked come to pass and should death result, such homicide, depending on the degree of recklessness, might be either involuntary manslaughter of the gross negligence variety (as in the case of Rebecca Garnett here) or second-degree murder of the depraved-heart variety. Should the injury to the person be in the form of non-fatal but nonetheless serious bodily harm, the consummated crime would be battery of the unintended variety.

In any event, the entire range of consummated crimes from which the inchoate crime of Reckless Endangerment is either one step removed (no actual harm) or two steps removed (neither actual harm nor intent to harm) represents the very paradigm of crime against the person—homicides and batteries and assaults, simple and aggravated, intended and unintended. In all of their forms and degrees, they are classically crimes against the person. It is even so with this newest inchoate addition to that inherently dangerous family.

We turn to the case law. With intentional homicide or any intentional crime of violence, the unit of prosecution is so self-evident that the issue seldom, if ever, arises. In *dicta,*

however, we did note in *Albrecht v. State,* 97 Md.App. 630, 685–86. n. 4, 632 A.2d 163:

> With intentional crimes of violence, it is clear that the unit of prosecution is each separate victim. To explode a bomb on an airplane containing 300 passengers and crew constitutes 300 murders, not one.

In *Blackwell v. State,* 278 Md. 466, 365 A.2d 545 (1976), the defendant committed one act of arson by throwing three bottles of gasoline into the window of a house with the intent to force a former girlfriend out of the house. Notwithstanding that single act, he was convicted on six charges of first-degree murder, one for each of the six persons who died in the fire.

*Smith v. State,* 31 Md.App. 106, 355 A.2d 527 (1976), was a case in which the defendant feloniously set fire to a bar and restaurant wherein seven persons were sleeping on an upper floor. Two of them were killed in the fire. The appellant was convicted for that single criminal act of two counts of murder and two counts of arson. Arson, like burglary, is generally conceptualized as a crime against habitation. In the *Smith* case, therefore, the unit of prosecution for arson was determined to be the structure that was burned and the multiplication of the arson charge by two was not permitted. One of the arson convictions was, therefore, vacated as redundant. Both murder convictions, on the other hand, were affirmed. Murder, unlike arson, is a crime against the person. The unit of prosecution is each person murdered. The multiplication of the charge by two, therefore, inappropriate with respect to arson, was perfectly appropriate with respect to murder.

Armed robbery is a classic example of a crime against the person and so is its attendant crime of using a handgun in the commission of an armed robbery. In *Brown v. State,* 311 Md. 426; 535 A.2d 485 (1988), the Court of Appeals affirmed six armed robbery convictions and six separate convictions for the use of a handgun in the perpetration of a crime of violence against the defense's challenge that there were but two armed robberies and two handgun offenses that had been perpetrated. Consolidated for consideration were two separate epi-

sodes of armed robbery, each involving a single criminal act but the first involving two simultaneous victims and the second involving four simultaneous victims. The appellant did not seriously challenge the multiplying of the armed robbery charges by the number of victims but strenuously challenged the multiplying of the handgun charges by the number of victims. The Court of Appeals, 311 Md. at 434, 535 A.2d 485, quoted with approval our opinion in *Manigault v. State*, 61 Md.App. 271, 279, 486 A.2d 240 (1985), in concluding:

> Brown contends that the unit of prosecution of § 36B(d) is the criminal transaction. He rests his argument on the assumption that "whether a felon robs a single individual, or hypothetically fifty people at a social gathering, there still remains only one 'use' of the handgun." Under Brown's theory, then, an individual who uses a handgun in a criminal transaction which results in one or more felony or violent misdemeanor convictions has committed only one handgun use offense regardless of the number of felony or violent misdemeanor convictions. The State, on the other hand, maintains that the unit of prosecution is the crime of violence and relies on the following passage from *Battle v. State*, 65 Md.App. 38, 50, 499 A.2d 200, 206 (1985), *cert. denied*, 305 Md. 243, 503 A.2d 252 (1986) (quoting *Manigault v. State*, 61 Md.App. 271, 279, 486 A.2d 240, 244 (1985)):

> "A single criminal episode may, of course, give rise to a number of separate charges, some of which may be multiplied but some of which may not. The key is to identify the unit of prosecution. *Both an aggravated assault* (Count 1) *and a simple assault* (Count 2) *may be multiplied when there are multiple victims. The unit of prosecution is the victim.* With respect to the use of a handgun to perpetrate a crime of violence (Count 4), the unit of prosecution is the crime of violence. Assuming that the other elements have been proved, two victims imply two crimes of violence. That, in turn, implies two separate crimes of using a handgun to commit a crime of violence."

Thus, under the State's theory, the number of handgun use offenses will equal the number of felony or violent misdemeanor convictions.

We agree with the construction advanced by the State. (Emphasis supplied.)

*Brown* went on to hold with respect to the multiple handgun convictions:

We are convinced that multiple handgun use convictions and sentences are appropriate where there are multiple victims. Brown's use of a handgun put each victim in the cases at bar in fear of death or serious bodily harm. Punishment for criminal conduct should be commensurate with responsibility and *a defendant who terrorizes multiple persons with a handgun is more culpable than a defendant who terrorizes only one.* (Emphasis supplied.)

311 Md. at 436, 535 A.2d 485.

A similar result was reached by Judge Alpert in *Battle v. State,* 65 Md.App. 38, 51, 499 A.2d 200 (1985):

Here there was one criminal episode—the use of the handgun in the robbery of the two employees at Bernard's. But there were convictions for two crimes of violence, proper in light of *Jackson.*

That a crime is inchoate rather than one involving consummated harm is immaterial in terms of computing the units of prosecution. In *Jackson v. State,* 63 Md.App. 149, 492 A.2d 346 (1985), *rev'd on other grounds sub nom. Cherry v. State,* 305 Md. 631, 506 A.2d 228 (1986), the defendant fired a single shot at two pursuing police officers. Notwithstanding his claim that this constituted but a single criminal act on his part, we affirmed the multiple convictions for two separate charges of assault with intent to murder. Judge Bishop observed:

Appellant argues that he cannot be convicted or sentenced for two counts of assault with intent to murder because, at best, the State proved that appellant fired only one shot at the two pursuing police officers. The essence of appellant's argument is that where one criminal incident

results in multiple victims, it is necessarily but one offense. This contention is without merit.

63 Md.App. at 157, 492 A.2d 346.

In *Hall v. State,* 69 Md.App. 37, 516 A.2d 204 (1986) *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987), Judge Karwacki, dealing with three aggravated assaults with intent to prevent lawful apprehension, rejected a similar defense claim that the crime should not be multiplied by the number of assault victims. He observed:

> The appellant's final argument related to the aggravated assault convictions is that because the evidence disclosed his firing only two shots, it cannot support convictions of assault with intent to prevent lawful apprehension upon three victims. This same argument was considered and rejected by this Court in *Jackson v. State,* where the appellant was convicted of two counts of assault with intent to murder despite firing only one shot at two pursuing police officers. (Citation omitted).

69 Md.App. at 50, 516 A.2d 204. *See also Cousins v. State,* 277 Md. 383, 354 A.2d 825 (1976) (where defendant wielded a knife against two store detectives, acquittal on charge of assaulting one detective did not bar subsequent prosecution for assault against the other detective because the two were separate offenses); *Harris v. State,* 42 Md.App. 248, 258, 400 A.2d 6, *rev'd on other grounds sub nom. Countess v. State,* 286 Md. 444, 408 A.2d 1302 (1979) ("assaults against multiple victims arising out of the same criminal incident are separate and distinct crimes").

Even in the case of an unintentional crime—where neither the harm nor even the threatening of harm is intended—the unit of prosecution remains each individual subjected to the harm or risk of harm. In *Savoy v. State,* 67 Md.App. 590, 508 A.2d 1002 (1986), we affirmed convictions on two separate counts of automobile manslaughter and two separate and consecutive five-year sentences in a case arising out of a single incident of grossly negligent driving. The issue in that case was virtually indistinguishable from the one now before us.

"In appellant's view, despite the occurrence of two deaths, only one sentence is permissible under Art. 27 § 388 because only one incident of grossly negligent driving took place." 67 Md.App. at 592, 508 A.2d 1002. Speaking through Judge Bishop, we rejected that contention. "[W]e have held that where a single criminal incident results in multiple victims, the number of victims can determine the number of violations." *Id.* at 594, 508 A.2d 1002.

The only distinction between the conduct of the appellant in this case and the conduct of the defendant in *Savoy* is that that case involved the grossly negligent driving of an automobile, whereas this case involved the grossly negligent handling of a shotgun. Whatever the instrumentality, the common denominator is gross negligence. Had the shotgun blast in this case killed not only Rebecca Garnett but also a hypothetical second victim, there can be no doubt that the appellant would have been guilty of two involuntary manslaughters and not one. Ratcheting the harm downward one step, if Rebecca Garnett and the hypothetical second victim had been hit by the blast but not killed, there can be no doubt that the appellant would have been guilty of two unintended batteries and not one. Ratcheting the harm downward another step, had the blast gone over the heads of Rebecca Garnett and the hypothetical second victim so that neither was injured, there can similarly be no doubt that the appellant would have been guilty of two reckless endangerments and not one.

The *Savoy* opinion found support for the decision in various quarters. One was the legislative reference to an automobile manslaughter victim in the singular:

[T]he plain language of the statute is in the singular using the words "death of another," and not "death of others." Since it is manifestly apparent that a single grossly negligent act may involve several victims, use of the singular "death of another" in the statute evinces a clear legislative intent to impose separate punishment for each victim killed, and not, as appellant argues, for each incident of negligent driving.

67 Md.App. at 594, 508 A.2d 1002. Just as the automobile manslaughter statute uses the phrase "death of another" rather than "deaths of others," so too does the reckless endangerment statute speak of a substantial risk of death or serious physical injury "to another person" rather than "to others" or "to other persons."

Judge Bishop also took note of a number of cases in which "multiple convictions and sentences [have] result[ed] from a single incident of grossly negligent driving," 67 Md.App. at 593, 508 A.2d 1002, citing *Willis v. State,* 302 Md. 363, 369, 488 A.2d 171 (1985) (two convictions under § 388, total sentence of five years); *State v. Moon,* 291 Md. 463, 464–65, 436 A.2d 420 (1981) (two convictions and maximum sentences under § 388, sentences running concurrently); *Boyd v. State,* 22 Md.App. 539, 540, 323 A.2d 684, *cert. denied,* 272 Md. 738 (1974) (two convictions and maximum sentences under § 388, sentences running concurrently).

We reiterate our holding that the unit of prosecution for the crime of Reckless Endangerment is each person who is recklessly exposed to the substantial risk of death or serious physical injury.

### No Multiplicity

As a direct result of that holding, it necessarily follows that the third count of the indictment was not, as urged by the appellant, multiplicious. The second count charged the reckless endangerment only of Rebecca Garnett specifically. Whatever else the third count may or may not have charged, it charged something other than the reckless endangerment of Rebecca Garnett and did not, therefore, redundantly charge the same offense already charged under the second count. Hence, no multiplicity.

### The Failure of the Third Count To Charge An Offense

Accepting, *arguendo,* that our holding might be that each person recklessly endangered is a separate unit of prosecution, the appellant turns from an attack on the redundancy of

the third count to an attack on its inadequacy to charge an offense. His position is that if the endangerment of a specific person is a necessary element of the crime of Reckless Endangerment, the failure of the third count to identify a specific victim was as fatal to the charge as would have been the failure to identify a homicide victim to a count charging murder or manslaughter.

The appellant would grant that there are circumstances in which the identity of a victim might not be ascertainable and that in such a case the victim might be identified as one whose identity is "to the grand jurors unknown." The appellant further urges, however, that this is not such a case and that the initial designation in the third count of the persons recklessly endangered simply as "other person(s) present on Larchmont Terrace" was nothing more than a blithe generality that ignored the significance of a designated victim as a necessary element of the crime.

We are not unmindful in this regard of the observation of Judge Delaplaine in *Adams v. State,* 202 Md. 455, 458–59, 97 A.2d 281 (1953), *rev'd on other grounds,* 347 U.S. 179, 74 S.Ct. 442, 98 L.Ed. 608 (1954):

One of the early rules of the common law was that the name of a person necessary for complete description of a crime should be stated in the indictment, if the name of such person is known. The obvious reason for this rule is that every person indicted for a crime is entitled to be informed of the nature of the charge as precisely as possible to enable him to properly prepare his defense. *State v. Rappisé,* 3 N.J.Super. 30, 65 A.2d 266. However, in order to prevent a failure of justice, it is now generally accepted that if the name of a person necessary for complete description of a crime is unknown to the grand jurors, they are justified in alleging that the name of such person is unknown to them.

In response to this complaint, the State urges that the issue has not been preserved for appellate review. The State looks to Md.Rule 4–252, which provides that certain mandatory motions, including one alleging a "defect in the charging

document," must be filed not only pretrial, but within the specific deadline established by subsection (b). The State alleges that this attack on the adequacy of the charge was not raised until the appellant made a motion for judgment of acquittal at the end of the State's case and, therefore, was woefully too late to preserve the issue for appellate review.

The State has overlooked, however, the complete wording of subsection (a)(2), which imposes the mandatory filing requirement only on "a defect in the charging document *other than* its failure to show jurisdiction in the court or *its failure to charge an offense.*" (Emphasis supplied.) The appellant's attack on the failure of the third count to charge an offense is covered, rather, by subsection (c), which provides in pertinent part:

A motion asserting failure of the charging document ... to charge an offense may be raised and determined at any time.

When the appellant finally took the State to task for its failure to designate any victim in the third count, the State immediately loaded the count with a surfeit of seven victims. Although it may have sinned anew by way of excessive response, it certainly atoned for its original stinginess in terms of naming a victim.

In any event, our conclusion that the third count was fatally defective in another respect makes it unnecessary for us to decide 1) whether the count as initially drawn failed to charge an offense or 2) if that should be the case, what the consequences would be.

### Amendments: Of Substance and of Form

The appellant takes additional umbrage at the amending process itself, claiming that the amendment to the third count was impermissibly one of substance and not merely of form. *Corbin v. State,* 237 Md. 486, 489–90, 206 A.2d 809 (1965), attempted to describe just what this contrast between substance and form connotes:

As to what constitutes substance and what is merely formal in an indictment, it may be said that all facts which must be proved to make the act complained of a crime are matters of substance, and that all else—including the order of arrangement and precise words, unless they alone will convey the proper meaning—is formal. We have held in the past that a criminal charge must so characterize the crime and describe the particular offense so as to give the accused notice of what he is called upon to defend and to prevent a future prosecution for the same offense. (Citations omitted).

See also *Thanos v. State*, 282 Md. 709, 712–16, 387 A.2d 286 (1978).

Generally speaking, amendments that have been deemed to be merely changes of form have been such things as a clerical correction with respect to the name of a defendant, the substitution of one name for another as a robbery victim, a change in the description of money, changing the name of the owner of property in a theft case, and changing the date of the offense. An amendment as to substance, by contrast, would change the very character of the offense charged. In the days before the consolidated theft statute, an amendment that would have changed a larceny into a larceny after trust or into an embezzlement or into a receiving of stolen goods would self-evidently be one of substance. In *Thanos v. State*, 282 Md. 709, 387 A.2d 286 (1978), an amendment of a shoplifting charge from one alleging the altering of a price tag to one alleging the removal of the price tag was deemed to have been an impermissible amendment as to substance. In *Busch v. State*, 289 Md. 669, 673, 426 A.2d 954 (1981), the Court of Appeals observed:

We think it equally clear that the basic description of the offense is indeed changed, not only when the amended charge requires proof of an act different from the act originally charged, but also when the amended charge requires proof of acts additional to those necessary to prove the offense originally charged. After an offense has been charged, another offense that requires proof of a different

or additional act may not be substituted for the offense originally charged on the theory that such an amendment is simply a matter of form.

None of this case law, however, squarely addresses the problem here raised by the appellant. All of the amendments that have been the subject of prior appellate analysis, whether they have changed the nature of the offense or not, have been internal amendments within the boundaries of a single offense. That is not what is before us. If it is not permitted to amend a charge so as to change the essential character of a single offense, it would seem, *a fortiori*, to be impermissible to add totally new offenses to the charge.

Quite aside from any question of whether the amended charge would otherwise be fatally flawed, it would seem that an amendment resulting in the charging of seven offenses where theretofore there had been but one, or none, would be preeminently an amendment going to substance. It would be an amendment, as *Gyant v. State,* 21 Md.App. 674, 321 A.2d 815, *cert. denied,* 272 Md. 742 (1974), prefers to phrase it, that would change (by multiplication) the character of the charge. Indeed, the precise wording of Maryland Rule 4–204 is, in pertinent part:

> On motion of a party or on its own initiative, the court at any time before verdict may permit a charging document to be amended except that *if the amendment changes the character of the offense* charged, the consent of the parties is required. (Emphasis supplied.)

Linguistically, of course, we may have a distinction without a difference. What was traditionally referred to as an impermissible amendment going to substance would now, *ipso facto,* be referred to as an equally impermissible "amendment chang[ing] the character of the offense." Similarly, what was traditionally a permissible amendment going only to form would not be deemed to be a forbidden changing of "the character of the offense." *Plus ca change, plus c'est la meme chose.*

Once again, however, our conclusion that the third count was fatally defective in another respect relieves us of the necessity of dealing with the propriety of the amendment.

### The Duplicity of the Third Count

■ Assuming, *arguendo*, that precise and timely objection had not been made to the amending *process* itself, but only to the substantive content of the count as ultimately amended, what then would we have? We would have exactly what is before us in this case—an amended third count that was fatally duplicitous. It would be before us just as if it had come from the Grand Jury in freshly minted, albeit duplicitous, form with no amending process having been involved.

Maryland Rule 4-203(a) permits, under certain circumstances, the charging of multiple offenses in a single indictment, *provided each such offense is charged in a separate count:*

> Two or more offenses, whether felonies or misdemeanors or any combination thereof, *may be charged in separate counts* of the same charging document if the offenses charged are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. (Emphasis supplied.)

The general rule was well stated in *Weinstein v. State*, 146 Md. 80, 125 A. 889 (1924), a case wherein the Court of Appeals reversed a conviction because a duplicitous count charged two distinct offenses:

> One of the appellant's objections to that indictment is that it includes in a single count charges of two several distinct, separate and unconnected offenses, and is therefore, duplicitous. If that objection is true in fact, it is in our opinion sound in law. For if two distinct crimes are charged in the same count, although they may believe him guilty of the other, the jury trying the case must nevertheless either convict the traverser of both or acquit him of both, since in such a case as this *there could be under the laws of this*

*State no splitting of the verdict. . . .* (Emphasis supplied.) (Citations omitted.)

*Id.* at 83, 125 A. 889.

The trial judge here did on the third count the very thing that *Weinstein* said no jury is ever permitted to do. He split the verdict—not guilty as to three victims but guilty as to four others. *See also State v. Warren,* 77 Md. 121, 26 A. 500 (1893); *Mohler v. State,* 120 Md. 325, 327, 87 A. 671 (1913).

*Kirsner v. State,* 183 Md. 1, 5, 36 A.2d 538 (1944), was also a case in which the Court of Appeals reversed a conviction because of duplicitous pleading. ("It is the general rule of the common law that an indictment should not charge in the same count the commission of two or more substantive offenses, and in the event that it does so it is objectionable because of duplicity.") *See also Jackson v. State,* 176 Md. 399, 401, 5 A.2d 282 (1939).

This Court first reversed a conviction because of duplicitous pleading in *Morrissey v. State,* 9 Md.App. 470, 473–74, 265 A.2d 585 (1970). Chief Judge Murphy (now Chief Judge of the Court of Appeals) there observed:

> The object of all pleading, civil and criminal, is to present a single issue in regard to the same subject matter; hence, it is against this fundamental rule to permit two or more distinct offenses to be joined in the same count. It is, therefore, the general rule that *an indictment charging the commission of two or more substantive offenses in the same count is objectionable as being duplicitous.* See also Maryland Rule 716a, [now Rule 4–203(a) ] providing that "Two or more offenses may be charged in the same indictment in a separate count for each offense." (Emphasis supplied.) (Citations omitted.)

In *Ayre v. State,* 21 Md.App. 61, 318 A.2d 828 (1974), we reversed a conviction because of our conclusion that the charging document "was fatally defective because it lumped all the offenses in one charge rather than having a separate charge for each offense." 21 Md.App. at 70, 318 A.2d 828. It was Chief Judge Orth who stated the general rule:

It is firmly established that only one offense may be charged in a single count. In other words, an indictment charging two or more substantive offenses in the same count is objectionable as being duplicitous.

21 Md.App. at 64, 318 A.2d 828. He pointed out that the provision that "different offenses are to be charged in a separate count for each offense ... is mandatory." 21 Md. App. at 65, 318 A.2d 828.

In *State v. Hunt*, 49 Md.App. 355, 432 A.2d 479 (1981), we affirmed, in the face of an appeal by the State, the decision of the trial judge to dismiss charges because of duplicity. We observed:

The rationale for the rule forbidding duplicity or "the joinder of two or more distinct and separate offenses in the same count" was succinctly set forth by the Court of Appeals in *State v. Warren*, [77 Md. 121, 122, 26 A. 500 (1893) ] where it said: *"The object of all pleading, civil and criminal, is to present a single issue* in regard to the same subject matter, and *it would be against this fundamental rule to permit two or more distinct offenses to be joined in the same count."* (Emphasis supplied.)

49 Md.App. at 358, 432 A.2d 479.

Accordingly, we reverse the conviction on the third count on the ground that the count was duplicitous, timely objection having been made to the duplicity.

### The Various Reckless Endangerments:
### Legal Sufficiency of the Evidence

#### A. Count Two: Rebecca Garnett

 Holding as we do that there was no flaw in the pleading of the second count, we turn of necessity to the appellant's further contention that the evidence was not legally sufficient to support the conviction on the second count, to wit, that Judge Messitte's verdict was clearly erroneous. The Court of Appeals decision in *State v. Albrecht*, 336 Md. 475, 649 A.2d 336 (1994), has already established that the evidence was legally sufficient in two significant regards. It held that

the appellant's act of moving his finger from the trigger guard to the trigger itself was sufficient to support a finding of gross negligence at that end of the firing line.

Intertwined with that holding was the closely related holding that the evidence was sufficient to permit a finding that the creation of such a risk *vis-a-vis* Rebecca Garnett was unjustified. Key to the holding was the conclusion that, because Rebecca Garnett posed no danger to the appellant or others, the creation of the risk as to her specifically was not *justified:*

> We find that sufficient evidence was presented from which the trial court could have found that *the use of deadly force against Rebecca Garnett would have been unjustified under the circumstances.* We find that the evidence was sufficient to establish that, notwithstanding the fact that Rebecca Garnett did not pose any danger to either Albrecht himself or to third parties, Albrecht took *substantial steps to use deadly force against her*—to wit, racking his shotgun and aiming it, with his finger on the trigger, at Garnett. (Emphasis supplied.)

336 Md. at 486, 649 A.2d 336.

Indeed, our initial reversal of the appellant's convictions was predicated on what we believed to have been the insufficiency of the evidence in those two very specific regards. We held that the unlimbering, racking and aiming of the weapon, in the abstract, was not under the circumstances a gross deviation from reasonable police behavior. We further held that even the creation of some risk *vis-a-vis* Rebecca Garnett was not unjustified because of her apparent close association with Darnell Budd and James Littlejohn and with the stabbing that had occurred a few blocks away a few minutes earlier. It was unnecessary for us, therefore, even to consider whether the evidence showed that Rebecca Garnett was within the arc of danger at the other end of the firing line (although the tragic result clearly demonstrated that she was). In reversing our decision, the Court of Appeals was only called upon to deal

with those issues with which we had dealt in reversing the convictions.

To the extent to which, therefore, any aspect of the reckless endangerment of Rebecca Garnett has not yet been formally analyzed in terms of the legal sufficiency of the evidence, we now hold that the evidence was legally sufficient to support the verdict of reckless endangerment as to her. If it was not already implicit, we now hold expressly that the evidence showed her to have been within the firing lane that was the arc of danger created when the appellant, unjustifiably with respect to her, placed his finger on the trigger.

## B. Count Three: Generally

With the third count, we are presented with a very different situation. Having reversed the conviction on the ground that it was duplicitously pleaded, it is not literally necessary to address any other attack the appellant makes on Count 3. Ordinarily, we would simply say that all other contentions with respect to it are mooted. That is not completely the case, however, when it comes to the appellant's contention that the evidence was not legally sufficient to sustain the conviction on that count.

A holding that the evidence was not legally sufficient would have possible double jeopardy repercussions, *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), that a reversal on any other ground would not. We hasten to add that we are not empowered to decide in advance a hypothetical double jeopardy issue that has never yet arisen, may never arise, and is not before us in any event. We are nonetheless aware that a ruling on legal sufficiency could at a later time become material if two conditions should come to pass: 1) if the State should elect to retry the appellant, and 2) if the appellant should then interpose the plea in bar of double jeopardy to such a retrial.

Even when our holding is that the evidence was not legally sufficient to sustain a conviction, it is not within our preroga-

tive to tell the State's Attorney that he may not attempt to retry the case. That is a matter within his unfettered control. There would, indeed, be no bar to the retrial if the defendant should either neglect to raise the double jeopardy defense or elect not to do so. It is not for us, moreover, to advise a defendant as to what his tactical response should be in such an eventuality. Because of the possible materiality that our holding might acquire, however, it almost always behooves us to address legal sufficiency as an issue not necessarily moot.

## C. Count Three: One Former Jeopardy or Seven?

There is in this case another bizarre (nay, bewildering) dimension that we feel compelled to address, even if only by way of deliberate *dicta*. If, as here, seven criminal offenses were charged, even though improperly, in a single count and a verdict (or verdicts) then rendered on that count, what are the double jeopardy implications of such a verdict?

If the verdict had been guilty on the third count generally, a reversal on any ground other than legal insufficiency would clearly contain no impediment to a retrial on the count. If the verdict, on the other hand, had been not guilty generally, *res judicata* or double jeopardy of the *autrefois acquit* variety, even if the acquittal had been erroneous, would bar a retrial on the count. Either of those unequivocal verdicts would have been easy to handle.

What we have before us, however, is a split verdict—four-sevenths guilty and three-sevenths not guilty. What are the double jeopardy implications of that? If, despite our protestations that a single count cannot yield a split verdict, the verdict was nonetheless most decidedly split. What kind of a verdict was it—a conviction or an acquittal? It is a question, perhaps, that does not yield a neat, Aristotelian, yes-or-no answer, because the surrealistic actuality is that it was neither and that it was both. It is a problem, moreover, that will not go away, for the appellant, after all, may not be content with a reversal of the conviction on the basis of duplicity. He may wish to go further and bar any possibility of a retrial.

If the count were to be deemed an indivisible monolith as to which the verdict was guilty, might not the appellant then be retried for the reckless endangerments of Officer Marvin Thomas, Iris Frazier, and Darnell Budd, charges, or subcharges, on which he may have thought that he had been acquitted? If a retrial with respect to those three alleged victims were, on the other hand, barred and if the third count is, indeed, an indivisible monolith, would not the binding acquittal with respect to three of its inextricable parts, parts that cannot be subtracted from the whole or otherwise factored out, necessarily imply an acquittal as to the third count *in toto?* The appellant may certainly make a cogent argument in this respect.

Another possibility looms. If such a double jeopardy problem should actually arise, the solution might be the purely practical one of sidestepping the doctrinal paradoxes and cutting the Gordian Knot. If a verdict that should never have been fragmented was nonetheless erroneously fragmented, the Court might, purely as a practical matter, elect to treat the ensuing legal sufficiency issues and their possible double jeopardy consequences on a fragment-by-fragment basis.

That practical solution contains within it a fascinating feature of its own. If we are to analyze on a fragment-by-fragment basis, just as if we were dealing with seven distinct verdicts on seven distinct criminal offenses, then the three acquittals on the factual merits may very well contain collateral estoppel implications affecting the possible retrials of the other four fragments. It behooves us, in any event, to examine the fragments.

### D. The Reckless Endangerment of Travell Dumar

█ The assessment of the legal sufficiency of the evidence to support a fragmented conviction for reckless endangerment is, except for the Rebecca Garnett case itself, easiest in the case of Travell Dumar. Travell Dumar was a four-year-old who was on the playground directly behind (from the appellant's point of view) the parked car in which Rebecca Garnett

and Darnell Budd had just arrived on Larchmont Terrace and in which James Littlejohn was still seated at the time of the appellant's shotgun fired. Travell Dumar's status as an innocent "passerby" was undisputed.

The grossly negligent or reckless risk-creating act was unquestionably the aiming of the shotgun by the appellant at Rebecca Garnett and the appellant's placing of his finger on the trigger so as to create the risk that even a nervous twitch or muscular spasm could cause the gun to fire. It was the accidental firing of the weapon that was the critical life-endangering act in this case and not anything that happened thereafter. Judge Messitte's fact finding was explicit as to the critical event that represented the risk to life in this case:

It is my belief that the Defendant's shotgun was aimed at Becky Garnett, as well as the others in the immediate vicinity of the green automobile, that Ms. Garnett's confused reaction to Defendant's commands startled him into pulling the trigger.

The only question with respect to Travell Dumar is that of where he was situated at the moment the gun was aimed at Rebecca Garnett and then accidentally fired. Was he, at that moment, arguably within the line of fire so as to have been actually at risk? At oral argument, the focus wandered a bit from this question to the very different question of whether Travell Dumar came running from outside the possible arc of danger into what had been the danger zone but arrived in that zone after the danger had passed (after the gun had fired). The testimony of Travell Dumar's mother, to be sure, had focused on his running toward her through what had been, just seconds before, the lethal fire lane. The State attempted to surmount this assumed geographic problem with respect to Travell Dumar's precise location at the moment the gun went off by positing the theory that the reckless endangerment did not end with the firing of the weapon, but persisted for some discernible, albeit brief, period of time thereafter as the appellant recocked his weapon and remained in a combat stance. That is adding to the reckless endangerment in this case, however, a dimension on the time line that was not

developed or relied upon as the theory of this case and, indeed, was not the basis for Judge Messitte's verdict. His fact finding, in pertinent part, was clear that it was the initial aiming of the loaded shotgun in Travell Dumar's direction that was the basis for his verdict:

> It is clear to me that ... Defendant's bringing to bear of a loaded shotgun in the direction of the green automobile created a substantial risk of death or serious physical injury to ... Travell Dumar playing nearby ...

We hold that the record adequately supported that finding of fact and the verdict based upon it. In this otherwise superbly tried case, the record with respect to the various reckless endangerments was, relatively speaking, tertiary in the most minimal sense of that term. This was completely understandable. The primary focus at trial was whether the appellant had intentionally killed Rebecca Garnett. Even the question of gross negligence and involuntary manslaughter, which so consumed the attention of this Court and the Court of Appeals, was secondary. Under the circumstances, the concern with the reckless endangerments was very peripheral.

The primary evidence as to reckless endangerment is State's Exhibit 1, a scale drawing of Larchmont Terrace, its parking places, the playground on one side of it, and the surrounding houses and sidewalks. On that Exhibit, various witnesses placed dots to indicate where various persons were standing at the moment the appellant's shotgun went off. If the direct line of fire from the appellant to Rebecca Garnett on that Exhibit is taken to be the central axis of endangerment, Travell Dumar's position at the moment the shotgun fired is within ten degrees to the right of that central axis. The distance from the appellant to Rebecca Garnett having been established as thirty-seven feet, the distance from the appellant to Travell Dumar was no more than seventy-five feet. The demonstrative evidence and the supporting testimony amply supports the trial judge's conclusion that Travell Dumar was clearly within the arc of danger at the very instance that the gun fired. The evidence was legally sufficient to support the conviction.

## E. The Reckless Endangerment of Carroll Walker

■ The assessment of the legal sufficiency of the evidence to support the fragmented reckless endangerment conviction with respect to Carroll Walker centers on precisely the same question of where Carroll Walker was situated at the moment the shotgun fired. With respect to this conviction, however, our holding is in the other direction.

On the evening of the shooting, Carroll Walker was visiting his girlfriend, Iris Frazier, who lived at 17740 Larchmont Terrace. Shortly before the shooting, Iris Frazier's three young children had been playing on the playground that later formed the backdrop for the shotgun blast that did not hit anyone on the playground but, with minimal movement of the gun to the right or the left, easily could have. Just before the police chase came to a halt on Larchmont Terrace, however, Carroll Walker, Iris Frazier, and Iris Frazier's three young children went inside Ms. Frazier's house to get something cold to drink. It was when Carroll Walker and Iris Frazier stepped back outside onto the walkway immediately in front of 17740 Larchmont Terrace that the police cars screeched to a halt in front of the suspect green car and the appellant's shotgun went off, killing Rebecca Garnett.

It is again the scale drawing of the Larchmont Terrace area that permits us to see where Carroll Walker was standing when the gun went off. He marked his position on the walkway with a red circle. Taking the line down which the appellant's gun was aimed at Rebecca Garnett as the main axis of danger, Carroll Walker's position was well off to the left, approximately thirty degrees, from that central axis. He was, moreover, almost three times as far away from the appellant as was Rebecca Garnett.

In terms of his physical location at the critical moment of danger, we hold that the evidence was not legally sufficient to support the conclusion that he was subjected to a substantial risk of death or serious bodily harm.

Equally foreclosing to the possibility of retrying the appellant for the reckless endangerment of Carroll Walker would

be the collateral estoppel implications flowing from the appellant's acquittal for the reckless endangerment of Iris Frazier. The situations with respect to Carroll Walker and Iris Frazier were precisely the same. They both enjoyed the status of innocent passersby. The appellant's act of gross negligence or recklessness was the same with respect to both alleged victims. They were both, moreover, at the same geographic location at the moment of danger. Both were in harm's way or neither was in harm's way.

Iris Frazier did not testify. Carroll Walker's testimony described the two of them going into the house together and then coming out of the house together. The sum total of the testimony with respect to their location came from Carroll Walker:

> Well, after *we'd got something* to drink *we came back* outside and *we was standing* right outside her front porch, down on her sidewalk in front of her house. (Emphasis supplied.)

Carroll Walker went on to explain that the two of them, he and Iris Frazier, remained in that position throughout the incident:

Q: And did you stay pretty much there up to the time that the police arrived?

A: Yes, sir.

Q: And were you in that same—I mean not exactly, you didn't have your feet glued to the ground—but were you in the same general spot or area when you saw the events that happened right after that?

A: Yes.

After Carroll Walker placed the red dot on the scale drawing of Larchmont Terrace, he indicated that it marked not only his position but Iris Frazier's position as well:

Q: Would you be able, with the Court's permission, to put a little circle, a little dot—not such a little dot—a dot that we can see, to show us where you were standing?

A: *We was like along in this area here.*

Q: All right. Do you want to make that dot a little bigger? *Was Iris next to you?*

A: *Yes, she was.* (Emphasis supplied.)

The fragmented verdicts delivered on the third count unequivocally included an acquittal on the charge of having recklessly endangered Iris Frazier:

> And he is guilty of the charge of reckless endangerment with regard to the persons of James Littlejohn, Tequila Frazier, Travell Dumar and Carroll Walker; but *not guilty as to others,* Darnell Budd among them. (Emphasis supplied).

The only possible basis for the verdict of not guilty with respect to the reckless endangerment of Iris Frazier had to be a finding of fact that she was not within the arc of danger radiating outward perhaps ten or fifteen degrees, both clockwise and counterclockwise, from the central axis down which the gun was being aimed. Indeed, Judge Messitte's fact finding was explicit that Iris Frazier was not in the "Defendant's line of fire":

> It is also clear to me that the issue of recklessness aside, Defendant's bringing to bear of a loaded shotgun in the direction of the green automobile created a substantial risk of death or serious physical injury to Rebecca Garnett, James Littlejohn and Darnell Budd, and, whether Defendant knew it or not, to Tequila Frazier on her tricycle, Travell Dumar playing nearby, and Carroll Walker standing on the front walk of a friend.
>
> Preliminarily, *the Court finds that there were no other persons in Defendant's line of fire who were subject to a substantial risk of death or serious injury at the indicated time and place,* so that to the extent that there could be liability, it would be limited with regard to the named individuals. (Emphasis supplied.)

The acquittal with respect to Iris Frazier necessarily rested on a finding of ultimate fact in the appellant's favor, to wit, that the spot where Iris Frazier was standing was not within the zone of peril. Carroll Walker, at the moment of the

alleged danger, was standing at essentially the same spot. At a contemplated retrial of the appellant for the reckless endangerment of Carroll Walker, the State would be collaterally estopped, if the appellant should timely raise the defense, from relitigating, possibly adversely to the appellant, the ultimate fact of whether that spot was in the arc of danger. The appellant has already won a victory on that factual issue and is entitled to "stand pat" with the favorable resolution. This is a classic instance of collateral estoppel. *Ford v. State*, 330 Md. 682, 718–19, 625 A.2d 984 (1993).

We hasten to add, however, that our observations on the possible collateral estoppel implications, unlike our supplemental holding on evidentiary sufficiency, are only *dicta*.

### F. The Reckless Endangerment of Tequila Frazier

The assessment of the sufficiency of the evidence to support the fragmented conviction with respect to Tequila Frazier brings to the fore a very different aspect of reckless endangerment law—the *mens rea* of recklessness.

As Carroll Walker and Iris Frazier emerged from 17740 Larchmont Terrace onto the front walk of that property, Iris Frazier's three-year-old daughter, Tequila, took off on her tricycle. As the suspect green car and then the two police cars moved into position for the ultimately lethal confrontation, Tequila was pedaling from the relative safety of where her front walk intersected with the public sidewalk down that public sidewalk directly into the impending line of fire. Just as the shotgun blast went off, Tequila emerged from behind the shield of the green car into what would have been the path of the shotgun pellets if the body of Rebecca Garnett had not intercepted every pellet.

Unlike other potential victims in the area, however, this three-year-old on her tricycle was not visible to the appellant. Her body was completely hidden by the green car as he leveled his weapon at Rebecca Garnett. The issue becomes that of whether a defendant can consciously disregard a risk

of harm to a particular victim when he is completely oblivious of the presence of such victim.

The answer is yes—at least under certain circumstances, such as those in this case. In *Williams v. State*, 100 Md.App. 468, 491–510, 641 A.2d 990 (1994), we analyzed in depth the *mens rea* of reckless endangerment. We there pointed out that a simplistic "objective *versus* subjective" choice of tests cannot be imposed on the issue because there is no single issue. There are at least five sub-issues that enter into the *mens rea* totality; some of them are to be measured subjectively and others are to be measured objectively.

The Maryland Reckless Endangerment Statute, Art. 27, § 120, is modeled on § 211.2 of the Model Penal Code. With only minor and inconsequential changes in wording, it provides that a person is guilty of the misdemeanor of reckless endangerment if he "recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another." The critical word, indeed the only word, that bears on the *mens rea* of the crime is the adverb "recklessly." Although Chief Judge Murphy pointed out in *Minor v. State*, 326 Md. 436, 442 n. 1, 605 A.2d 138 (1992), that Maryland has not adopted the Model Penal Code's definition of "recklessly," there is nothing in that definition that is at all incompatible with the Court of Appeals opinion in *Minor*. In our *Minor v. State*, 85 Md.App. 305, 315, 583 A.2d 1102 (1991), Judge Bishop recognized the persuasive authority of § 2.02(2)(c) of the Model Penal Code when he quoted it with approval:

A person acts recklessly with respect to a material element of an offense when he *consciously disregards a substantial and unjustifiable risk* that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation. (Emphasis supplied.)

The question, as the appellant phrases it, is "Was there a conscious disregard of a substantial risk to Tequila Frazier?" The State responds to the question with another question, "Does there need to be?" The answer is that there does, indeed, have to be on the appellant's part a "conscious disregard" of a known risk. It is not required, on the other hand, that the appellant be "conscious" of the fact that the risk he is disregarding is necessarily "substantial" or that it is a "risk to Tequila Frazier."

In *Williams v. State,* we discussed the *mens rea* requirement of a "conscious disregard" of risk:

Reckless endangerment is a crime that has not eliminated the requirement of a *mens rea.* It is not a strict liability crime. One is not guilty if he is oblivious to the fact that there is a risk and oblivious to the fact that he is disregarding the risk; it is not enough that the ordinary prudent person would be thus aware. It is required that the defendant on trial be aware of a risk and then consciously disregard it. That much is indisputably subjective. In shortest form, the critical *mens rea* would be "the conscious disregard of a substantial risk." "Conscious disregard" is *ipso facto* subjective.

100 Md.App. at 503, 641 A.2d 990.

Thus, if the appellant had come to Larchmont Terrace to take target practice at the green automobile in the still midwatches of the night when the car was known to be empty and when it appeared that all the residents were safely in their beds, the appellant would not have been guilty of reckless endangerment in firing his shotgun. Disturbing the peace, perhaps, but not reckless endangerment. If the circumstances had been such that he neither knew nor necessarily should have known that any human being was abroad, he would not have been guilty of reckless endangerment, even if in actuality one human being had been abroad and had been objectively placed in danger by the appellant's target practice. If Tequila Frazier on her tricycle, for example, had come pedaling out from behind the shield of the green automobile at

the very instant the appellant fired off a round, she would have been, objectively, at substantial risk of death or serious injury, although the appellant would not, subjectively, have been guilty of a conscious disregard of risk. The *actus reus* of the crime would have been present, but not the *mens rea.* That illustrative scenario, however, is of no avail to the appellant under the very different circumstances of this case.

█ It is required that a defendant be subjectively aware of a risk and then consciously disregard it. The only thing of which a defendant need be subjectively aware, however, is that he is creating and disregarding *some risk* to the life or limb of *someone.* The defendant need not be consciously aware of or appreciate the fact that the risk he is creating and disregarding is "substantial" rather than slight. That actual measurement of the magnitude of the risk will be made objectively without regard to the defendant's state of mind. In *Williams,* we analyzed this objectively measured assessment of the risk that is created and then disregarded:

It is in measuring that substantiality of the risk that an objective test is involved. Although the defendant must subjectively have known of some risk and have consciously disregarded it, the defendant need not subjectively have assessed the risk as being substantial. That is a thing to be objectively measured. If the defendant subjectively believes the risk not to be substantial but, objectively measured, it is deemed substantial, the objective measurement is the only one that counts. It must always be carefully remembered, however, that the objective test goes only to the sub-issue of whether the risk is, indeed, substantial. It does not eliminate the necessity of a subjective awareness of some risk and a subjective and conscious disregard of that risk. A defendant must subjectively disregard a risk that is objectively substantial. Finely parsed, that is what both this Court and the Court of Appeals said in *Minor.*

100 Md.App. at 503–04, 641 A.2d 990.

█ When the appellant aimed his shotgun in the direction of Rebecca Garnett and moved his finger to the precarious

position of the trigger itself, he knew or should have known that he was creating a risk of harm to someone. He consciously disregarded that risk. For starters, the appellant consciously disregarded a known risk to Rebecca Garnett, James Littlejohn, and Darnell Budd. Whether the risk created, with respect to any or all of those particular persons, was a justified or an unjustified risk is an objective fact to be objectively determined. A subjective mistake of judgment in that regard will not negate the appellant's *mens rea.*

The appellant also knew or should have known that he was creating a risk to Travell Dumar, Carroll Walker, and Iris Frazier. Whether any or all of those persons were actually in the arc of danger were also objective facts to be objectively determined. The proximity of a possible victim to the danger is self-evidently one aspect of whether the risk is substantial. The defendant's subjective assessment of that purely tactical situation is also of no consequence.

Of a similar objective quality is the issue of whether one victim or multiple victims were actually endangered by the appellant's creation and disregard of a risk. That is simply an historic fact. In proving its initial case with respect to the indispensable first victim, the State, of course, must establish the appellant's blameworthy *mens rea.* To that end, it probes the appellant's subjective state of mind. At that point, however, the *mens rea* has been established. Any increment of victims beyond one involves only incremental proof as to the *actus reus* and no incremental proof as to the *mens rea.* Proof of the *actus reus* is, by its very nature, objective.

If it is objectively determined, as it has been, that the substantial risk to Rebecca Garnett was unjustified, the appellant is guilty of the reckless endangerment of Rebecca Garnett, even if he subjectively believed the risk to her to have been justified. If it is objectively determined, as it has been, that Travell Dumar was in the path of danger, the appellant is guilty of the reckless endangerment of Travell Dumar, even if the appellant subjectively believed that Travell Dumar was beyond any risk of harm.

By the same token, if it is objectively determined, as it has been, that Tequila Frazier was actually endangered by the appellant's conduct, the appellant is guilty of the reckless endangerment of Tequila Frazier, even if he subjectively was totally unaware of her presence at the scene. We determine the units of prosecution objectively without regard to what was in the appellant's mind. The evidence was legally sufficient to support the fragmented verdict of conviction in the case of Tequila Frazier.

Because none of the three fragmented verdicts of acquittal involved, let alone hinged upon, this interplay of the unseen victim and the appellant's *mens rea,* they clearly possess no possible collateral estoppel implications with respect to this particular conviction.

### G. The Reckless Endangerment of James Littlejohn

On the variegated smorgasbord of reckless endangerment problems presented by this case, the assessment of the legal sufficiency of the evidence to support the conviction for the reckless endangerment of James Littlejohn presents yet another variety.

The appellant's creation of a substantial risk of harm to James Littlejohn and his conscious disregard of that risk is not disputed. The location of James Littlejohn in the line of fire is not disputed. The appellant's awareness of the presence of James Littlejohn is not disputed. Involved, rather, is a frequently neglected nuance of reckless endangerment law—the issue of whether the creation of a substantial risk and the conscious disregard thereof may not be justified with respect to certain persons in certain circumstances.

Unlike Travell Dumar, Tequila Frazier, Carroll Walker, and Iris Frazier, James Littlejohn (along with Rebecca Garnett and Darnell Budd) did not enjoy the status of innocent bystander. He, by way of sharp contrast, was a suspect who had fled, or reasonably appeared to have fled, the scene of a crime and was subject to legitimate police apprehension. His case

engages the gears of possible justification for a risk that would not be countenanced if directed at an innocent bystander.

In *Williams v. State,* we made significant reference to the fact that the risk of death or serious bodily harm must be not only "substantial" but also "unjustified":

> Actually, to qualify a defendant as "reckless," it is necessary that the risk that is consciously disregarded be, objectively measured, *not only quantitatively substantial but also qualitatively unjustified.* Although this second characteristic of the risk is less frequently the subject of litigation, it remains a necessary component of recklessness. In this regard, the Commentary to the Model Penal Code noted:
>
> > Under Section 2.02, the actor must perceive and consciously disregard a *substantial and unjustifiable risk* that his action will or may place another in danger of death or serious injury. Further, the nature and purpose of the actor's conduct and the circumstances known to him must be such that his disregard of the risk amounts to "a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." *This requirement excludes from liability under this section both unconscious risk creation and conscious endangering where the circumstances justify such conduct.* Thus, for example, violently shoving a child down a railroad embankment may involve risk of serious injury. Such conduct would not be covered, however, if it were done in order to avoid the immediate prospect of more serious harm from an approaching locomotive. In this case, *the risk, even though substantial, is not unjustifiable.* (footnote omitted) (emphasis supplied.)
>
> Model Penal Code and Commentaries § 211.2, at 203 (Official Draft and Revised Comments 1985). (Emphasis supplied.)

100 Md.App. at 503–04, 641 A.2d 990.

On this sub-issue of possible justification for consciously taking a risk, the initial question has to be that of whether the opinion of the Court of Appeals in this case, holding as it did

that the evidence was sufficient to permit a finding that the risk taken was not justified with respect to Rebecca Garnett, is dispositive of the justification sub-issue generally. We hold that it is not.

Following the stabbing that had occurred a few minutes earlier a few blocks away, two or three black males had been observed to leave that crime scene in the car that turned out to be the car driven by Rebecca Garnett. The officers who responded to that earlier crime scene, including the appellant, were given information that "the two or three males in the group were drug dealers and that the group might be carrying guns." *Albrecht v. State,* 97 Md.App. at 679, 632 A.2d 163. This was the situation confronting the appellant as he approached the suspect vehicle on Larchmont Terrace and prepared to make a "felony stop."

Initially, there was little to separate Rebecca Garnett from Darnell Budd and James Littlejohn. As we pointed out in *Albrecht v. State:*

Darnell Budd, Rebecca Garnett, and James Littlejohn were all suspects. It was Rebecca Garnett who had driven two or three males away from the stabbing scene. In view of the tight time sequence, there was every reason for an arresting officer to believe that both Darnell Budd and James Littlejohn were two of the males driven from the stabbing scene. As Officer Albrecht approached Larchmont Terrace, both Darnell Budd and Rebecca Garnett were observed by him to be returning rapidly to the green Chevrolet automobile as they observed his approach.

97 Md.App. at 673, 632 A.2d 163.

As the appellant, however, focused on Rebecca Garnett, the suspect who was closest to him and who was commanding his primary attention, distinguishing differences developed. As the Court of Appeals carefully noted, the appellant was able to eliminate Rebecca Garnett as a "threat." She was standing in the open and her hands were visible. She clearly did not possess a weapon. The Court of Appeals particularly noted the appellant's testimony wherein he distinguished between

Rebecca Garnett, who was not a "threat," and Darnell Budd and James Littlejohn, both of whom continued to be "threats":

> I looked at Mr. Budd. I said, "He's still a threat." I looked at Mr. Littlejohn, "He's still a threat." I looked at Ms. Garnett. I said, "She's not—" I didn't think to myself that she was a threat. She was standing in the open. She had a bag of chips in her hand. Her other hand was out. She was wearing a white blouse and beige—orange—shorts that were fairly tight fitting on her and I just didn't feel threatened by her at that point. And I was beginning to bring the gun up to put it in a position to bring it to bear on Darnell Budd, because he's still behind the car and he's making a lot of motions with his hands. He's still moving around a lot. And just as I was doing that I heard an explosion.

Quoted at 336 Md. 496, 649 A.2d 336.

In examining the appellant's recklessness as he disregarded the risk of possible accidental harm to Rebecca Garnett, the Court of Appeals looked to the Montgomery County police regulations and the distinction recognized by those regulations between the permissible treatment of those who pose a threat and those who are but innocent bystanders. Rebecca Garnett had clearly moved, in the eyes of the Court, from the first category into the second:

> [T]he Montgomery County police department's Field Operations Manual specifically provides that an officer may draw a firearm when the officer has "reason to fear for his safety or the safety of others," but that "officers must use caution when discharging a firearm to avoid endangering the lives of bystanders." With respect to the use of a shotgun, "officers must exercise *extreme caution* when removing the shotgun from the vehicle" because of the danger that a discharge of the weapon may present to innocent bystanders. (Emphasis in original.)

336 Md. at 503, 649 A.2d 336.

The rationale of the Court of Appeals in analyzing the recklessness displayed by the appellant *vis-a-vis* Rebecca Garnett distinguished her situation from those of Darnell Budd and James Littlejohn. The characterization by the

Court of Appeals of her situation has no applicability to the very different situations involving Budd and Littlejohn:

> According to Albrecht's own testimony, he did not believe that Rebecca Garnett posed any danger to him or to any other person, she was "the least of [his] worries," and he had "checked her off." ... Officer Thomas testified that Rebecca Garnett had "done nothing" to warrant having a shotgun racked and aimed at her.... Griffin testified that *the decision to aim the shotgun should be predicated upon a reasonable perception that the person at whom it is being aimed poses a threat, and that, if aimed, the officer's finger is permitted to be within the shotgun's trigger guard....* The trial court could have found that *Albrecht* racked his shotgun, aimed it at Garnett, and *placed his finger on the shotgun's trigger, notwithstanding the fact that he had no reason to believe that it would be necessary to shoot her.* (Emphasis supplied.)

336 Md. at 504, 649 A.2d 336. By contrast, there was still reason to believe that it might become necessary to shoot Budd or Littlejohn or both.

The holding of the Court of Appeals was very explicit that the evidence was legally sufficient to permit a finding that the appellant's taking of "substantial steps to use deadly force" was "unjustified" in the case of Rebecca Garnett for the reason that she "did not pose any danger."

> We find that sufficient evidence was presented from which the trial court could have found that the use of deadly force against Rebecca Garnett would have been *unjustified under the circumstances.* We find that the evidence was sufficient to establish that, notwithstanding the fact that *Rebecca Garnett did not pose any danger* to either Albrecht himself or to third parties, Albrecht took substantial steps to use deadly force against her—to wit, racking his shotgun and aiming it, with his finger on the trigger, at Garnett. (Emphasis supplied.)

336 Md. at 486, 649 A.2d 336.

That analysis, however, is by no means apposite to the appellant's very different situation *vis-a-vis* both Darnell

Budd and James Littlejohn. They had not yet been neutralized as "threats." It was known that they were possibly armed. As long as the chance remained that either could, in an instant, draw and fire at the officers, the appellant could not be faulted for being in a full combat mode. Even the minimal movement of a finger from the trigger guard to the trigger might give an armed and dangerous opponent a split-second advantage in beating an officer to the draw.

Nothing in the Court of Appeals decision contradicted in any way our characterization of the threat posed by both Budd and Littlejohn:

When Officer Albrecht and Officer Thomas took off in pursuit of those suspects, *they had been told that the two or three males in the group were drug dealers and that the group might be carrying guns* . . . . In approaching a felony stop rife with that potential, *that fear is not dissipated until* the scene is neutralized and *the hands of all suspects have been observed.* The arresting officers "get the drop on" the suspects first and only lower their weapons after they are reassured that the suspects pose no danger. When Officer Albrecht saw no weapons in the hands of Rebecca Garnett, he "checked her off" in his mind and was about to direct his attention to Darnell Budd and James Littlejohn when his shotgun accidentally discharged. The larger danger had not yet dissipated. Both Officer Albrecht and Officer Thomas were concerned about the hands of Darnell Budd. Officer Albrecht described Budd as "manipulating" his shirt and preventing Officer Albrecht from getting an unimpeded view of Budd's hands. Viewing events, as we must, from the perspective of the officers on the scene, Darnell Budd cannot, as of the moment of the encounter, be lightly dismissed as "not the most fearsome type." (Emphasis supplied.)

97 Md.App. at 679, 632 A.2d 163.

Our earlier observations, as we turned our attention to Littlejohn specifically, continue, in our judgment, to be valid:

What is nowhere mentioned in the fact finding of the court is that *James Littlejohn posed the most serious danger of all three suspects.* The trial judge had earlier admonished that "in evaluating the reasonableness" of Officer Albrecht's conduct, "his actions must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." "With 20/20 vision of hindsight," we now know that Littlejohn was an unarmed blind man and posed no danger at all. The officers, however, did not know that as they approached the scene. Officer Thomas knew Littlejohn by sight but acknowledged that, as he approached the scene, he did not know who that third figure in the back seat of the green Chevrolet was. *Littlejohn,* as that third figure, *was shielded behind the front seat. His hands were completely out of the view of both officers.* *"From the perspective of a reasonable officer on the scene,"* *Littlejohn was most definitely a suspect and posed a clear threat to the officers.* (Emphasis supplied.)

97 Md.App. at 679–80, 632 A.2d 163. In no sense was Littlejohn yet neutralized as a threat to the officers.

Even assuming the fragmented verdict of conviction for the reckless endangerment of James Littlejohn to have been somehow permissible, we hold that the evidence was not legally sufficient to support it.

Equally foreclosing to the possibility of retrying the appellant for the reckless endangerment of James Littlejohn would be the collateral estoppel implications flowing from the appellant's acquittal for the reckless endangerment of Darnell Budd. The situations with respect to James Littlejohn and Darnell Budd were indistinguishable.

Our task is to determine, if we can, the necessary finding on the factual merits that could explain the acquittal of the appellant for the reckless endangerment of Darnell Budd. Darnell Budd was indisputably in the arc of danger created when the appellant aimed the shotgun at Rebecca Garnett and placed his finger on the trigger. The deviation to the leftward from the central axis of danger was significantly less in the

case of Darnell Budd than it was in the case of Carroll Walker, whom the fact-finding judge found to have been in the path of danger. The distance from the appellant's gun to Darnell Budd, moreover, was little more than one-third of the distance from the gun to Carroll Walker. The judge's fact finding explicitly determined that Darnell Budd was one of those persons who was in the appellant's "line of fire":

It is also clear to me that ... Defendant's *bringing to bear of a loaded shotgun in the direction of the green automobile created a substantial risk* of death or serious physical injury *to* Rebecca Garnett, James Littlejohn and *Darnell Budd,* and, whether Defendant knew it or not, to Tequila Frazier on her tricycle, Travell Dumar playing nearby, and Carroll Walker standing on the front walk of a friend.

Preliminarily, the Court finds that *there were no other persons in Defendant's line of fire* who were subject to a substantial risk of death or serious injury at the indicated time and place, so that to the extent that there could be liability, it would be limited with regard to the named individuals. (Emphasis supplied.)

Notwithstanding that unequivocal finding of fact that Darnell Budd was physically in the zone of danger, the verdict was equally unequivocal that the appellant was not guilty of the reckless endangerment of Darnell Budd:

And he is guilty of the charge of reckless endangerment with regard to the persons of James Littlejohn, Tequila Frazier, Travell Dumar and Carroll Walker; *but not guilty as to others, Darnell Budd among them.* (Emphasis supplied.)

The only possible basis for that acquittal had to be an implicit finding of fact that the creating and the disregarding of a substantial risk of death or serious bodily harm by the appellant that was unjustified in the case of innocent bystanders and also unjustified in the case of Rebecca Garnett, who had been neutralized and determined not to be a threat to the officers, was not an unjustified risk with respect to one, such

as Darnell Budd, who had not yet been neutralized as a threat to the officers.

As indisputably non-neutralized threats, the situations of Darnell Budd and James Littlejohn were indistinguishable. The appellant, having benefited from a favorable finding of fact that the risk to one who was still "a threat" was justified, may not now have that fact relitigated against him at a retrial involving James Littlejohn.

Once again, however, we hasten to add that our observations on the possible collateral estoppel implications, unlike our supplemental holding on evidentiary sufficiency, are only *dicta.*

### *Conclusion*

On remand from the Court of Appeals to consider those contentions not earlier addressed by us nor addressed at any time by them, we hold that the appellant's conviction for reckless endangerment on the second count is affirmed and that his reckless endangerment conviction (or convictions) on the third count is reversed.

Assuming without deciding that the erroneously fragmented verdicts of conviction under the third count might somehow retain vitality for purposes of possible retrial, we also look to the legal sufficiency of the evidence to sustain those fragmented convictions. Our hypothetical and supplemental holdings in that regard are that the evidence was legally sufficient to sustain convictions for the reckless endangerments of Travell Dumar and Tequila Frazier but was not legally sufficient to sustain convictions for the reckless endangerments of Carroll Walker and James Littlejohn.

*JUDGMENT OF CONVICTION UNDER THE SECOND COUNT AFFIRMED; JUDGMENT OF CONVICTION UNDER THE THIRD COUNT REVERSED; COSTS TO BE PAID BY MONTGOMERY COUNTY.*