583 A.2d 1102

**Nelson MINOR**

v.

**STATE of Maryland.**

**No. 78, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 14, 1991.

John L. Kopolow, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and BISHOP and ALPERT, JJ.

BISHOP, Judge.

On February 14, 1990 appellant, Nelson Minor, was convicted in a non-jury trial in the Circuit Court for Baltimore City of reckless endangerment in violation of Md.Code Ann. art. 27, § 120. Appellant was sentenced to four years, and all but the time already served awaiting trial was suspended. Appellant was also sentenced to five years probation. The sole issue presented on appeal is whether the evidence was sufficient to sustain the conviction.

## FACTS

This case proceeded on what counsel represented to be an Agreed Statement of Facts:

The police were called on December the 13th, 1989 to the house at thirty-five hundred Woodbrook Avenue at approximately 12:51 a.m.

Police officers responding there found the situation as follows: the deceased in this case, Kenneth Minor, the brother of the defendant, was seated in a chair next to a table with blood proceeding from his mouth and nose.

Found on the floor in the living room area was a pump shotgun. The shotgun when it was examined contained a spent shotgun shell in the chamber and two other shotgun shells in the magazine ready to be channeled into the chamber.

Next to the victim on the table was a can of beer and a bottle of M D Twenty/Twenty fortified wine.

Present also in the house were the defendant, Nelson Minor and another person, another resident there who apparently had no knowledge of what had happened.

Nelson Minor was interviewed and, in fact, a formal written statement was taken at police headquarters.

State would submit as State's Exhibit One the advisement of rights and in that formal written statement which I would at this time read portions of it into the record.

After being advised of his rights, Mr. Minor was basically asked what happened and he stated:

"It was about ten or fifteen minutes before I made the phone call to 911. We was sitting down at the dining room table drinking and stuff and I was saying 'you think I won't be able to pull a trigger on a gun.' And I said, 'I don't believe you'll do it.' And he said 'I'll do it.' We had just been talking about Russian roulette and I said that you can't play Russian Roulette with a shotgun because it don't have a barrel for to put one bullet in to play Russian roulette. I said once you put one in the chamber, that's it. So I handed it to him thinking that he was going to cut the safety off and give it back to me to put it away and I went to take another drink and I was reaching towards the bottle to take another drink and I was looking at the bottle. That's when he pulled the trigger and the boom sound and it had muffled. It wasn't loud so I looked up in the ceiling and I seen it wasn't nothing on the ceiling, so I got out of my chair and I looked and this when I seen blood running out of his mouth and running down his shoulder. His head was lying to the side on his shoulder. So when I realized what he had did, I went to the bedroom and told Blake what he had did." Blake was the other resident of the home. He was questioned:

"Where did you get the shotgun from.

It was behind the bed in my bedroom.

Q. Why did you get it?

A. I got it because me and a guy on the street had been having some words and I was walking around the house with it because I thought he might be coming over to the house."

Can't make out this word. I believe it's frail.

THE DEFENDANT: Yes.

MR. DOREY: 'Frail', nickname for his brother, "was sitting at the table having a drink so I sat down with him, I was sitting at the table drinking because we had been drinking all that day.

Q. How was the shotgun loaded?

A. It had three shells in there.

Q. Was it ready to fire?

A. Yea. It was one already in the chamber.

Q. Where were the other two shells?

A. They was up in the shotgun.

Q. Was the safety on or off?

A. The safety was off.

Q. Do you mean it was ready to fire?

A. Yea, it was ready to fire.

Q. How did you get involved in the conversation about Russian roulette?

A. We had the gun sitting there beside me on the floor. Like I had said, I had words with the guy on the street.

Q. When did you talk about Russian roulette?

A. Well, the shotgun was sitting near here on the floor, (pointing down to his right side) and he was sitting here (pointing off to this left) and somehow it just came up. And I told him you can't play no Russian roulette with no shotgun like this one. So he said give it here and like I said I expected him to turn off the safety and give it back and say here, boy, you'd better stop playing around with this.

Q. Did you tell him the gun was loaded?

A. Yea, he knew it was loaded.

Q. Did you tell him the safety was off?

A. Yea, he knew everything was off. I told him the safety ain't on. He was forty-two years old and I listened to him and stuff. That why I didn't expect him to do that.

Q. Had he been drinking?

A. Yea.

Q. What did he have to drink that day?

A. We had a couple of fifths of M D Twenty–Twenty. grape wine. We drank about three or four fifths that day. I was high off of the drinks, cocaine and heroin.

Q. Where did you get the money for that stuff?

A. He had gave me some money.

Q. How much money?

A. He had left—he had lent me twenty dollars and I had ten from the day before.

Q. Can you think of anything else?

A. No, all I can say is I just didn't think he would do nothing like that. We had played with it before. I used to let him shoot it and stuff."

There is a question about where he was sitting and he drew a diagram.

"Q. Did you tell him to go first to, call his bluff?

A. Yea.

Q. Did he say anything after that?

A. Yea, he said you know that I will do it. So I thought that he was bullshitting me so I gave it to him and I was reaching for the bottle when he did it.

Q. Can you think of anything else?

A. No, just that we was real close."

Then after that he signed the statement.

Your Honor, I don't have an autopsy to present but I will present this statement, a photograph of the shotgun and also a photograph of Kenneth Minor as he was found seated at the table.

MR. MARCUS: No objections, Your Honor.

MR. DOREY: The autopsy would have revealed, Your Honor, that, in fact, he—Kenneth Minor died as a result

of a shotgun blast apparently through the mouth. The pellets penetrated the brain and shattered the roof of the skull but did not actually penetrate the skin so that the entire force of the charge was contained within his head and skull.

Detective Stienhist would identify defendant seated at counsel table and were we to have proceed to trial we would have submitted the shotgun and Mr. Copera from the Baltimore City Police Department would have indicated that shotgun was operational and quite capable of being fired and we would all concede as the statement indicates, you can't play Russian roulette with a pump shotgun because once you pull the trigger the gun goes off.

That is the statement of facts.

THE COURT: Any additions or corrections?

MR. MARCUS: Judge, Mr. Minor and I have discussed the matter. There would be no corrections or additions to that statement.

Although the foregoing was categorized as an "Agreed Statement of Facts" at trial, the State now contends that it was merely an agreement of the facts to which witnesses would testify if called to the stand. What might be a crucial issue, however, is contained in Appellant's signed statement in which Appellant indicated that he expected the victim, Kenneth Minor, to turn off the safety and return the gun. The State argues that the trial court was not bound to accept this portion of Appellant's post-arrest statement.

Since we find that the foregoing statement was, contrary to the State's contention, indeed an "Agreed Statement of Facts",[1] the subjective belief of the Appellant, that the victim would not pull the trigger and would return the gun, is a fact which the trial court was bound to believe based on

---

1. There are some cases that should not be decided on an agreed statement of facts. This is one of them.

our holding in *Barnes v. State*, 31 Md.App. 25, 354 A.2d 499 (1976). In *Barnes* we observed at 35, 354 A.2d 499 that:

There is a distinction between an agreed statement of facts and evidence offered by way of stipulation. Under an agreed statement of facts both State and the defense agree as to the ultimate facts. Then the facts are not in dispute, and there can be, by definition, no factual conflict. The trier of fact is not called upon to determine the facts as the agreement is to the truth of the ultimate facts themselves. There is no fact-finding function left to perform. To render judgment, the court simply applies the law to the facts agreed upon. If there is agreement as to the facts, there is no dispute; if there is dispute, there is no agreement.

\*       \*       \*       \*       \*       \*

On the other hand, when evidence is offered by way of stipulation, there is no agreement as to the facts which the evidence seeks to establish. Such a stipulation only goes to the content of the testimony of a particular witness if he were to appear and testify. The agreement is to what the evidence will be, not to what the facts are. Thus, the evidence adduced by such a stipulation may well be in conflict with other evidence received. For the trier of fact to determine the ultimate facts on such conflicting evidence, there must be some basis on which to judge the credibility of the witness whose testimony is the subject of the stipulation, or to ascertain the reliability of that testimony, to the end that the evidence obtained by stipulation may be weighed against other relevant evidence adduced.

In the *Barnes* case, it was clear that, although the facts were not presented as an "Agreed Statement of Facts", they were not disputed. There was no evidence for the court, as the trier of fact, to weigh and no need to judge the credibility of a witness. *Barnes* at 30, 354 A.2d 499. There was no conflicting evidence which required resolution to enable the court to determine the facts. *Id.* All that

remained to be done was for the court to apply the law to the undisputed facts of the case. *Id.*

Similarly, in the case *sub judice,* the facts were not disputed. The prosecutor recited an "Agreed Statement of Facts" and defense counsel indicated that there would be no corrections or additions to the statement. There was no conflicting evidence which required the court to make determinations of fact. The court was simply required to apply the law to the undisputed facts. Consequently, the trial court was bound by Appellant's subjective belief that the victim would not pull the trigger and would return the gun.

### *Discussion*

■ Appellant contends that the evidence was insufficient to sustain his conviction. Appellant argues that he did not have a reckless state of mind because he perceived no substantial risk of death or injury. Appellant believed that his brother, Kenneth Minor, was "bullshitting" him and had no intention of using the gun in what would be an act of certain self-destruction.

According to appellant, merely handing someone a loaded gun and, in effect, daring him to use it on himself, does not create a substantial risk that he will do so. Rather, the victim created the risk of death or serious physical injury when he held the gun to his head and pulled the trigger. Appellant maintains, therefore, that the risk of death or serious bodily injury was the result of Kenneth Minor's unforeseeable, independent act of free will. We disagree and explain.

Appellant was convicted of reckless endangerment in violation of Md.Ann.Code art. 27, § 120 (Supp.1990) which provides:

§ 120. Reckless endangerment.

(a) Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a

fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

(b) This section does not apply to any conduct involving the use of a motor vehicle as defined in 11–135 of the Transportation Article.

(c) This section does not apply to any conduct involving the manufacture, production, or sale of any product or commodity. (1989, ch. 460).

This statute was enacted in 1989 to prohibit "conduct which, while not criminal under current law, creates a substantial risk that a criminal act will result." [2] Bill Analysis, H.B. 1448, Senate Judicial Proceedings Committee, 1989 ("Bill Analysis"); Floor Report, H.B. 1448, Senate Judicial Proceedings Committee 1989 ("Floor Report"). As the Commit-

---

2. *Other states have enacted similar statutes. See e.g.,* Ill.Ann.Stat. ch. 38, § 12–5 (Smith–Hurd 1961) (a person who causes bodily harm to or endangers the bodily safety of an individual by any means, commits reckless conduct if he performs recklessly the acts which cause the harm or endanger safety, whether they otherwise are lawful or unlawful); Tenn.Code Ann. § 39–13–103 (1982 & 1990 Supp.) (a person commits an offense who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury); Vt.Stat.Ann. tit. 13, § 1025 (1974 & 1990 Supp.) (a person who recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury shall be imprisoned for not more than one year or fined not more than $1,000.00 or both); and Wash.Rev.Code § 9A.36.050 (1988) (a person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct not amounting to reckless endangerment in the first degree but which creates a substantial risk of death or serious bodily injury to another person). Some states require extreme indifference to human life as an element of reckless endangerment. *See,* Conn.Gen.Stat. §§ 53a–63 and –64 (1989). Ky.Rev. Stat.Ann. § 508.060 (1990) (wanton endangerment in the first degree); N.Y.Penal Law § 120.25 (Consol.1984 & 1990 Supp.) (reckless endangerment in the first degree); Wis.Stat.Ann. §§ 940.23 and 941.30 (West 1981 & 1990 Supp.). Other reckless endangerment statutes do not proscribe conduct which creates a substantial risk of death. These statutes only prohibit conduct which creates a substantial risk of serious physical injury to another person. *See e.g.,* Ala.Code § 13A–6–24 (1982); Alaska Stat. § 11.41.250 (1989); Ky.Rev.Stat.Ann. § 508.070 (1990) (wanton endangerment in the second degree); N.Y. Penal Law § 120.20 (Consol.1984 § 1990 Supp.) (reckless endangerment in the second degree).

tee observed, the purpose of the statute, like the statute prohibiting reckless driving, Md.Transp.Code Ann. § 21–901.1, is to deter crime before injury or death occurs. *Id.*

■ Substantially similar language appears in § 211.2 of the Model Penal Code, captioned "Recklessly Endangering Another Person", which provides:

A person commits a misdemeanor if he recklessly engages in conduct which places or may place another person in danger of death or serious injury. Recklessness and danger shall be presumed where a person knowingly points a firearm at or in the direction of another, whether or not the actor believed the firearm to be loaded.

The explanation, advocated by the Senate Judicial Proceedings Committee on the floor of the Senate of Maryland during the passage of this bill, contained language very similar to that used in the Model Penal Code.[3] Section 2.02(2)(c) of the Model Penal Code which defines "recklessly" as follows:

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."

Accordingly, in order for a person to act recklessly he must disregard a substantial risk.

---

**3.** According to the comment accompanying § 211.2, only Wisconsin enacted a general recklessness endangerment statute prior to the Model Penal Code's proposed law. Section 941.30 of Wisconsin's Criminal Code (originally passed in 1955) provides:

Whoever endangers another's safety by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, is guilty of a Class D felony.

■ To commit the crime of reckless endangerment, however, a defendant need not intentionally cause a result or know that his conduct is substantially certain to cause a result. " 'Recklessness' in causing a result exists when one is aware that his conduct *might* cause the result, though it is not substantially certain to happen." (emphasis in original). LaFave & Scott, *Substantive Criminal Law*, § 3.7(f) (1989). According to LaFave and Scott:

One may act recklessly if he drives fast through a thickly settled district though his chances of hitting anyone are far less than 90%, or even 50%. Indeed, if there is no social utility in doing what he is doing, one might be reckless though the chances of harm are something less than 1%. Thus, while "knowledge" and the knowing-type of "intention" require a consciousness of almost-certainty, recklessness requires a consciousness of something far less than certainty or even probability.

*Id.* (footnote omitted).[4]

Other jurisdictions with analogous statutes have similarly held that the offense of reckless endangerment is not dependent upon intent.[5] In *People v. Graham*, 41 A.D.2d 226, 342 N.Y.S.2d 361 (1973), the Supreme Court of New York, Appellate Division, affirmed defendant's conviction

---

**4.** The substance of the term "recklessness", as provided by LaFave & Scott and the Model Penal Code, is primarily objective. All that is required is that the defendant consciously disregard a substantial risk, even if the chances of harm are improbable. This is in contrast to the subjective element of negligence which is defined in § 32.02(2)(d) of the Model Penal Code as follows:

A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.

**5.** Although the statutes are not identical, we are satisfied that the statutory differences do not affect the intent element of the crime.

under that state's reckless endangerment statute which provided:

§ 120.25. **Reckless endangerment in the first degree.** A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person.

At trial, evidence was presented that during the course of an argument between the defendant and the complainant, the defendant pulled an unloaded pistol from his waistband, pointed it at the complainant's chest and pulled the trigger. The gun did not fire because there was no bullet in the chamber and the safety was engaged. After further argument, the defendant released the safety device, chambered a live cartridge and fired again. This time defendant held the pistol eight inches from the complainant's head and fired to the side of her head. The defendant denied having any intent to injure the complainant and claimed that he was simply trying to scare her. He argued that the reckless endangerment statute was designed to encompass only those situations where the act was not directed at any specific individual.

The court ruled that the statute was intended to cover the conduct of the defendant. The court explained that even if the defendant did not intend to injure the complainant and even if he was an expert marksman and the pistol was in perfect working order, the complainant's own possible movements raised an element of risk. Consequently, the court had no difficulty in holding that the defendant was correctly found guilty of reckless conduct, under circumstances evincing a depraved indifference to human life, which created a grave risk of death.

Similarly, in *People v. Davis*, 72 N.Y.2d 32, 530 N.Y.S.2d 529, 526 N.E.2d 20 (Ct.App.1988), the New York Court of Appeals determined that reckless endangerment is not an intent crime. Determining whether the crime of reckless endangerment was committed entails an objective assess-

ment of the degree of risk presented by the defendant's reckless conduct. The court held that "[t]he *risk* of injury alone sustains prosecution" for reckless endangerment. *Id.* 530 N.Y.S.2d at 531, 526 N.E.2d at 22 (emphasis added).

In *Hennemeyer v. Commonwealth*, 580 S.W.2d 211 (1979) the Supreme Court of Kentucky stated that the offense of wanton endangerment is not dependent upon intent. *Id.* at 215 citing *Thomas v. Commonwealth*, 567 S.W.2d 299 (1978) (a person cannot intend to act wantonly or recklessly).

The Supreme Court of Vermont similarly held that Vermont's reckless endangerment statute was intended to proscribe conduct which would place a victim in actual danger of death or serious bodily injury, not mere apparent danger. *State v. McLaren*, 135 Vt. 291, 376 A.2d 34, 36 (1977). That court found that the state of mind of a defendant as it relates to the loaded nature of a firearm is irrelevant. *Id.*

In *Commonwealth v. Penn Valley Resorts, Inc.*, 343 Pa.Super. 387, 494 A.2d 1139 (1985), the defendant corporation was convicted of violating a statute that provided:

A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious injury.

The conviction was sustained where an agent of the defendant corporation served alcoholic beverages to a twenty-year-old student who later died in an automobile accident. *Id.* at 1141–45. Serving intoxicating beverages to a minor or visibly intoxicated person alone may not constitute reckless endangerment. In *Penn Valley*, however, the serving of alcohol, coupled with several crucial elements known to the agent, established causation and therefore the offense of reckless endangerment. Not only did the agent observe the victim's inebriated condition, but he also commented on the victim's drinking problem. *Id.* The agent also witnessed attempts by others to preclude the victim from driving an automobile, and he refused to call the police when requested to do so. *Id.* Finally, the agent grabbed

the victim's car keys from someone who was attempting to stop the victim from driving and gave the keys to the victim. *Id.*

In the case *sub judice,* the facts indicate that appellant was aware of the ultimate outcome involved in playing Russian roulette [6] with a loaded shotgun. Appellant was also aware of the fact that Kenneth Minor had been drinking and that he said that he intended to pull the trigger. According to appellant's signed statement, Kenneth Minor told appellant "You know that I will do it." Moreover, appellant admitted that he told Kenneth Minor "to go first to, call his bluff." It is clear, therefore, that even though appellant believed that Kenneth Minor was "bullshitting" him and would not pull the trigger, appellant was aware that his conduct, handing the loaded shotgun to Kenneth Minor following the foregoing conversation, *might* cause death or serious bodily injury.

Appellant did not merely hand a loaded shotgun to "someone" and dare him to hold it to his head and pull the trigger. Rather, after discussing Russian roulette, appellant handed a loaded shotgun to his brother who had been drinking and had told appellant that he would pull the trigger if given the gun. Consequently, even though appellant did not believe that his brother would pull the trigger on the loaded shotgun, the act of handing the loaded shotgun to Kenneth Minor after discussing Russian roulette and, in effect, daring Kenneth Minor to pull the trigger, constitutes conduct that created a substantial risk of death or serious physical injury. Appellant consciously disregarded the substantial and unjustifiable risk that Kenneth Minor might indeed carry out his promise to pull the trigger of the loaded shotgun and thereby shoot himself.

---

**6.** Technically this was not Russian roulette which is defined as "[a] stunt in which a person spins the cylinder of a revolver loaded with one bullet, aims the muzzle at his head, and pulls the trigger." THE AMERICAN HERITAGE DICTIONARY p. 1137 (1981).

Based on these facts, we find that the evidence was sufficient to show that the appellant created a substantial risk that his brother would do what he did.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.