REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2489

September Term, 2014

_____

BROOKS S. PERRY

v.

STATE OF MARYLAND

_____

Eyler, Deborah S.,
Leahy,
Moylan, Charles E.,
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Leahy, J.

_____

Filed: September 28, 2016

Appellant Brooks Sinclair Perry led police on a high-speed car chase in Talbot County, Maryland, after he fled the scene of a traffic stop conducted by Trooper Tanner Nickerson during the late evening of March 12, 2014. Trooper Nickerson pursued Perry—who, he suspected, was intoxicated—down Route 50. Corporal Joshua Resh and Corporal Emerick soon joined the chase in their police vehicles. Perry abandoned his vehicle in the middle of Route 50 after it began to overheat and fled on foot into a nearby golf course.

All three officers continued the chase on foot, over and around dirt mounds, through the golf course. Perry jumped over a fence, exiting the golf course in the direction of Route 50. Once Perry landed on the other side of the fence, Corporal Resh observed a muzzle flash and heard a gunshot coming from Perry's direction, prompting Resh to unholster his gun and return fire. Perry escaped unharmed but was apprehended twelve hours later. A gun was never recovered.

Perry was tried and convicted by a jury in the Circuit Court for Talbot County of, *inter alia*, two counts of reckless endangerment, negligent driving, and reckless driving. Perry presents several issues on appeal, which we have rephrased:

I. Did the State fail to present sufficient evidence to support Perry's convictions for reckless endangerment?

II. Did the trial court err in permitting the State to introduce inadmissible expert testimony regarding the alleged "muzzle flash"?

III. Did the trial court deny Perry a fair trial by coercing the jury to reach a verdict on an artificially shortened timetable imposed by the court?

IV. Did the trial court err by failing to merge Perry's negligent driving and reckless driving convictions and then vacate the negligent driving conviction?

1

We hold that the jury was presented with sufficient evidence to find that Perry's reckless conduct placed both Corporal Resh and Trooper Nickerson in substantial risk of death or serious physical injury. We further determine that Perry failed to preserve both his argument that Corporal Resh's testimony was inadmissible expert testimony and his argument that the judge coerced the jury by not raising contemporaneous objections. We agree that Perry's negligent driving and reckless driving *sentences* should be merged; however, the separate *convictions* stand under *Moore v. State*, 198 Md. App. 655 (2011).

**BACKGROUND**

The following testimony and evidence was presented at Perry's trial before a jury in the Talbot County Circuit Court on October 1 and 2, 2014.

Trooper Nickerson recounted that shortly after beginning his 11 p.m. to 7 a.m. shift on March 12, 2014, he obtained radar readings of 71 miles per hour and 75 miles per hour from Perry's vehicle as it was heading westbound on Route 404. He activated his emergency equipment and initiated a traffic stop. After radioing the barracks his location and the tag number, make, and color of Perry's vehicle, Trooper Nickerson approached on the driver's side, identified himself, and requested Perry's driver's license and registration.

Perry, who was alone in the vehicle, did not produce a license or registration. He told Trooper Nickerson that his name was Christian Lawrence Perry, born July 5th, 1988. Trooper Nickerson returned to his car, gave the name to the dispatcher at the barrack, and informed the dispatcher that he was going to do a field sobriety test after observing that the "driver had glassy bloodshot eyes. Slurred speech."

Trooper Nickerson re-approached the vehicle and asked Perry whether he would perform field sobriety tests to ensure that he could drive the vehicle safely. Perry asked Trooper Nickerson whether he was going to search the vehicle, and, after being assured by Nickerson that he was not, Perry agreed to perform the tests. Perry exited the vehicle and faced away from Trooper Nickerson, toward the front of the vehicle. Trooper Nickerson observed Perry adjusting "something in his, in the front of his pants, belt, waist area."

Perry asked Trooper Nickerson whether he was going to search him and whether he had called for backup. Trooper Nickerson told Perry that he was going to search him, but did not respond to Perry's inquiries about backup. Perry turned around twice to talk to Trooper Nickerson, and, each time, Trooper Nickerson instructed him to turn back around and place his hands on the trunk. Perry complied, but after the second time, Trooper Nickerson instructed Perry to get back in his vehicle because, he explained, "I didn't feel comfortable with [Perry] outside the vehicle with just me there. I didn't know if he had any weapons on him. What his plans were." Trooper Nickerson decided to wait for the backup units before attempting to search Perry.

Perry returned to his vehicle and suddenly Trooper Nickerson observed the brake lights come on and Perry's hand go "down by the shifter." Perry drove away from the traffic stop. Trooper Nickerson immediately entered his car, radioed the barracks and began pursuing Perry with his emergency equipment on. He attained a speed of approximately 100 miles per hour for about a mile and a half while pursuing Perry. During this time he was in radio contact with his backup units, Corporal Emerick and Corporal Resh, providing them with his location during the pursuit.

3

Perry's vehicle began to smoke and slow down to approximately 50 miles per hour. Trooper Nickerson testified that smoke was coming from "the engine. . . .[t]he whole car." Corporal Resh joined the pursuit as Perry's vehicle continued on until it reached Hog Neck Golf Course,[1] at which time it slowed to 5 miles per hour in a crossover turn lane. Perry opened the driver's side door while the car was still moving, jumped out of the car, and started running toward the golf course. Corporal Resh stopped his car, exited, and immediately began pursuing Perry on foot. He followed Perry through a gate into the golf course and along the fence line parallel to Route 50.

Meanwhile Trooper Nickerson pulled into the golf course where he joined Corporal Emerick and together they ran around the backside of the dirt mounds between Route 50 and the golf course. Trooper Nickerson described the mounds as difficult to get around, relating that "[y]ou c[ouldn]'t see over top of [the dirt mounds]."

Although he was originally 40 yards behind Perry, Corporal Resh explained that he was able to close that distance to 10-15 yards because Perry fell three times on the uneven terrain. At the third fall, Corporal Resh illuminated Perry with a flashlight and advised him to stay on the ground. To the contrary, Perry sprang up and continued the pulse-racing chase. Corporal Resh testified that Perry jumped onto the fence, and as he got down on the other side, he "heard a gunshot and [] observed a muzzle flash,"—occurrences that were "[a]lmost simultaneous[]." Corporal Resh was surprised because he had not seen Perry

---

[1] According to the transcript, Trooper Nickerson said "Hog Creek Golf Course," however, our research indicates that "Hog Neck Golf Course" is the correct name. *See* Hog Neck Golf Course, http://www.hogneck.com/ [https://perma.cc/NM3R-5UTF].

with a weapon. He immediately unholstered his weapon, a Glock .40 caliber pistol, and returned fire—three consecutive shots, and then a fourth approximately a second later. Corporal Resh admitted at trial that he did not know whether Perry fired the gun intentionally or accidentally.

Trooper Nickerson heard gunshots coming from the other side of the mound that he was crossing and immediately dropped to the ground. He did not know who was shooting or from where the gunshots were originating. Nickerson recounted that "[t]here was one [gunshot] and then there was I believe two or three I heard right after that."

Perry escaped across Route 50. The police set a perimeter around the area, and Perry was located and arrested approximately 12 hours later. At some point it was discovered that Perry was not Christian Lawrence Perry, but rather Brooks Sinclair Perry, born January 27, 1986.

Evidence was offered during trial that three .40 caliber cartridge casings were recovered from the golf course side of the fence, and one .45 caliber cartridge casing was recovered from the Route 50 side of the fence. No bullets were ever recovered. According to Susan Kaim of the Maryland State Police, who was qualified as an expert firearms and tool marks examiner, the .40 caliber cartridges were from Corporal Resh's gun, but the .45 caliber cartridge was not.

At the close of trial, Perry was found not guilty of attempted second-degree murder, first-degree assault, and second-degree assault. He was, however, convicted of two counts of reckless endangerment for putting Trooper Nickerson and Corporal Resh at substantial risk of death or serious physical injury, fraudulent use of identification to avoid

5

prosecution, attempting to elude a uniformed police officer by failing to stop, two counts of attempting to elude a uniformed police officer by fleeing on foot, attempting to elude police in an official police vehicle by failing to stop, reckless driving, negligent driving, and failure to display a license on demand.

On December 15, 2014, Perry was sentenced to 11 years' imprisonment. Perry noted an appeal on January 6, 2015.

Additional facts will be presented as they pertain to the discussion.

## DISCUSSION

### I. Reckless Endangerment

Perry argues that the State failed to present sufficient evidence at trial that his conduct created a substantial risk of death or serious bodily injury to Trooper Nickerson or Corporal Resh. He urges this Court to reverse his reckless endangerment convictions because the record lacks evidence that either officer was in the line of fire of "the gun allegedly fired by [him]." The State disputes Perry's contention that the officers were not recklessly endangered because they were not within Perry's line of fire, and asserts that Perry would have been culpable even if the police had merely found the gun on his person without it ever having been fired because reckless endangerment is an inchoate offense.

On appeal in a criminal case, we review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533 (2003) (citations omitted). When making this determination, the appellate court is not required to determine "'whether *it* believes that the evidence at the trial established guilt

6

beyond a reasonable doubt.'" *State v. Manion*, 442 Md. 419, 431 (2015) (emphasis in original) (quoting *Dawson v. State*, 329 Md. 275, 281 (1993)). Rather, it is the trier of fact's task to weigh the evidence, and the appellate court will not second guess the determination of the trier of fact "'where there are competing rational inferences available.'" *Manion*, 442 Md. at 431 (quoting *Smith v. State*, 415 Md. 174, 183 (2015)). We nod with approval at the State's commentary that, when reviewing the legal sufficiency of the evidence, "this Court does not act like a thirteenth juror weighing the evidence[.]"

### A. The Purpose of the Reckless Endangerment Statute is to Deter Potentially Harmful Conduct

In Maryland, reckless endangerment is a statutory crime, codified at Maryland Code (2002, 2012 Repl. Vol.), Criminal Law ("Crim."), § 3-204, which states in pertinent part:

> (a) *Prohibited.* — A person may not recklessly:
>
> (1) engage in conduct that creates a substantial risk of death or serious physical injury to another. . .
>
>               * * *
>
> (b) *Penalty* — A person who violates this section is guilty of the misdemeanor of reckless endangerment and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both.

The Court of Appeals has interpreted this statute to require the State prove: "1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly." *Jones v. State*, 357 Md. 408, 427 (2000) (citation omitted). The corresponding Maryland Criminal Pattern Jury Instruction states:

> The defendant is charged with the crime of reckless endangerment. In order to convict the defendant of reckless endangerment, the State must prove:

7

(1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another;

(2) that a reasonable person would not have engaged in that conduct; and

(3) that the defendant acted recklessly.

The defendant acted recklessly if [he] [she] was aware that [his] [her] conduct created a risk of death or serious physical injury to another and then [he] [she] consciously disregarded that risk.

MPJI-Cr 4:26A Reckless Endangerment.

The instructions given to the jury in this case were substantially similar.[2] Notably, it is not a requirement that the individual have *intended* to cause the result. *Minor v. State*, 85 Md. App. 305, 316 (1991). Rather, the applicable *mens rea*, derived from the statute's employment of the term "reckless," is the "conscious disregard of a substantial risk" of harm. *Williams v. State*, 100 Md. App. 468, 503 (1994). Indeed, the statute applies even when the harm was never consummated, as in Perry's case on appeal, because, as this Court explained in *Williams*, the purpose of the reckless endangerment statute is to *deter* reckless behavior *before* a criminal act results:

> Reckless endangerment is quintessentially an inchoate crime. It is designed to punish potentially harmful conduct even under those fortuitous

---

[2] The Judge instructed the jury:

"In order to convict the Defendant of Reckless Endangerment, the State must prove, one, that the Defendant engaged in conduct that created a substantial risk of death or serious physical injury to another. Two, that a reasonable person would not have engaged in that conduct and three, that the Defendant acted recklessly. The Defendant acted recklessly if he was aware that his conduct created a risk of death or serious physical injury to another and then he consciously disregarded the risk."

8

circumstances where no harm results. Judge Bishop explained, 85 Md. App. at 314–315, 583 A.2d 1102:

> This statute was enacted in 1989 to prohibit "conduct which, while not criminal under current law, creates a substantial risk that a criminal act will result." Bill Analysis, H.B. 1448, Senate Judicial Proceedings Committee, 1989 ("Bill Analysis"); Floor Report, H.B. 1448, Senate Judicial Proceedings Committee 1989 ("Floor Report"). As the Committee observed, *the purpose of the statute,* like the statute prohibiting reckless driving, Md. Transp. Code Ann. § 21–901.1, *is to deter crime before injury or death occurs. Id.* (footnote omitted) (emphasis supplied).

The words of Chief Judge Murphy were of similar import in *Minor v. State,* 326 Md. at 442, 605 A.2d 138:

> It is readily evident from the plain language of § 120(a)[3] that it was enacted to punish, as criminal, reckless conduct which created a substantial risk of death or serious physical injury to another person. *It is the reckless conduct and not the harm caused by the conduct,* if any, *which the statute was intended to criminalize.* (emphasis supplied).

As with all inchoate crimes, reckless endangerment was intended to plug a gap in the law. Inchoate crimes are designed to inhibit criminal conduct before it goes too far or to punish criminal conduct even when, luckily, it misfires. Reckless endangerment is, indeed, doubly inchoate. At the *actus reus* level, it is one element short of consummated harm. At the *mens rea* level, it is one element short of the specific intent necessary for either an attempt or for one of the aggravated assaults.

---

[3] The statute was enacted as 1989 Md. Laws, ch. 469 (H.B. 1448) and codified at Maryland Code (1957, 1992 Repl. Vol.), Art. 27 § 120. Section 120(a) read:

(a) Any person who recklessly engages in conduct that creates a substantial risk of death or serious physical injury to another person is guilty of the misdemeanor of reckless endangerment and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both.

In 1996, Maryland Code (1957, 1996 Repl. Vol.), Art. 27 § 12A-2(a) replaced Art. 27 § 120(a) with only minor, non-substantive changes. *See* 1996 Md. Laws, ch. 561 (S.B. 215). As the quoted text demonstrates, Crim. § 3-204 is substantially similar to the original statute.

100 Md. App. at 480-81 (italic emphasis in original) (bold emphasis supplied).

Perry's argument on appeal focuses on the *actus reus*—whether the State offered sufficient evidence regarding the "line of fire" of the gunshot to support a finding that he engaged in conduct that created a substantial risk of death or serious physical injury. He does not dispute that the conduct he engaged in was that which a reasonable person would not engage in, nor does he argue that his actions were not reckless. Therefore, we turn to the question of whether the record supports a finding that Perry's reckless actions actually created a substantial risk of death or serious physical injury to Corporal Resh and Trooper Nickerson.

## B. The *Actus Reus* is Measured Objectively

It is well established in Maryland that "'the *actus reus* of creating a substantial risk is to be measured objectively, not subjectively . . . on the basis of the physical evidence in the case.'" *Hall v. State*, 448 Md. 318, 330 (2016) (quoting *Williams*, 100 Md. App. at 495). Objectively, we need not pause to inquire whether a loaded gun is the kind of instrument that can create a substantial risk of death or serious physical injury. The proper inquiry is into whether the gun was handled in a manner that created a substantial risk sufficient to find reckless endangerment. Our survey of Maryland appellate opinions reveals that the reckless endangerment statute is most frequently applied in situations involving firearms. *See, e.g.*, *State v. Pagotto*, 361 Md. 528, 553 (2000); *Thompson v. State*, ___ Md. App. ___, ___, No. 168, September Term 2015, slip op. at 27 (filed Aug. 31, 2016); *Marlin v. State*, 192 Md. App. 134, 140 (2010); *Boyer v. State*, 107 Md. App. 32, 36-38 (1995); *Wieland v. State*, 101 Md. App. 1, 6 (1994). Indeed, we observed in

10

*Moulden v. State*, 212 Md. App. 331, 356 (2013) that documents in the legislative history file of the reckless endangerment statute express a particular concern for the reckless discharge of firearms. 212 Md. App. at 356 (citing Senate Judicial Proceedings Committee Floor Report on H.B. 1448 (1989) ("This bill prohibits conduct which, while not criminal under current law, creates a substantial risk that a criminal act will result. According to testimony, individuals who recklessly shoot firearms without criminal intent near roads or buildings cannot be prosecuted under current law.")) (other citations omitted).

It is axiomatic that the use of a gun does not always create a substantial risk sufficient to find reckless endangerment. *See Williams*, 100 Md. App. 497-99 (citing *People v. Davis*, 526 N.E.2d 20 (N.Y. 1988)). In *Williams*, this Court examined the *Davis* decision because it "elaborated on the necessity that a risk actually be created," *id.* at 498, noting in that case "the *actus reus* of risk creation had not occurred, notwithstanding the defendant's aiming and attempting to fire a gun, because the gun was inoperable." *Id.* at 497. The *Williams* Court quoted *Davis* at length:

> Moreover, even if a gun is fired, that standing alone, is not enough to constitute commission of the crime. *The use of the gun must create a risk.* Thus, it has been held that shooting a pistol into the air or in the general direction of a roadway but considerably short of it does not constitute reckless endangerment. In this case, the evidence established that *although defendant pulled the trigger his gun did not fire and thus his conduct could not create a risk of death* to Officers Freeman and Farley. (Citations omitted) (emphasis supplied).

*Id.* at 498 (quoting *Davis*, 526 N.E.2d at 22). In other words, "'factual impossibility eliminates the risk essential to commission of the crime.'" *Id.* at 499 (quoting *Davis*, 526 N.E.2d at 22).

11

The State allows that it is an "uncontroversial point" that the use of a gun might not create a substantial risk of death or serious physical injury; however, the State argues that "whether conduct is a gross departure from the standard of conduct that a law-abiding person would observe is a question determined objectively based on all the surrounding circumstances." The State appears to conflate two issues: (1) whether the conduct, objectively viewed, created a substantial risk of death or serious physical injury to anyone, and (2) whether Perry acted recklessly with conscious disregard or wanton indifference to the creation of such a risk. In this appeal, however, we are concerned only with the first issue, and regardless of whether Perry's conduct was a gross departure from that of a law-abiding citizen, as we just observed, factual impossibility would eliminate the risk essential to commission of the crime of reckless endangerment. *See Williams,* 100 Md. App. at 498 (stating that the only issue on appeal in *Davis* was the establishment of the *actus reus*); *see also Albrecht v. State*, 105 Md. App. 45, 77 (1995) (stating that the reckless conduct was the officer's placement of his finger on the trigger, and the accidental firing of the weapon was the life-endangering act, prompting the Court to determine whether the individuals at the scene were within the arc of danger).

In *Albrecht v. State*, on remand from the Court of Appeals, this Court upheld a number of reckless endangerment charges against a police officer. 105 Md. App. at 45. The Court of Appeals determined that the officer's actions were grossly negligent when he deviated from acceptable police practice. After arriving at the scene of an alleged stabbing, the officer placed his finger on the trigger of his gun, which was aimed at a person he believed was involved in the alleged crime, "thereby increasing, if not creating, the danger

12

that a nervous twitch or an uncontrollable muscular spasm might cause the weapon to fire accidentally." *Id.* at 50. This Court determined that the officer's act created a substantial risk of death or serious bodily injury to the person upon whom the officer leveled his gun, as well as to those additional individuals who were within the "arc of danger" of his "line of fire." *Id.* at 74, 77-79, 86. With respect to a four-year-old child who was on the playground behind the person at whom the officer was pointing his gun, Judge Moylan, writing for this Court, instructed that the inquiry should be: "was [the child] at that moment, arguably within the line of fire so as to have been actually at risk?" The Court concluded that even though the gun was pointed at another person, the evidence supported a finding that the child was "within the arc of danger at the very instance that the gun fired[,]" and therefore, "[t]he evidence was legally sufficient to support the conviction" of reckless endangerment. *Id.* at 78.

Perry relies on this Court's holding in *Albrecht* to argue that there is no evidence in the record that either Corporal Resh or Trooper Nickerson were in his "line of fire," and therefore, the evidence is insufficient to support a finding that he is guilty of reckless endangerment. Because Trooper Nickerson was "behind a hill" when the gun was fired, Perry insists that "there is absolutely no possibility based on the record that Trooper Nickerson was at risk of being hit by the bullet."

The State distinguishes *Albrecht*, underscoring that there the defendant was a police officer who "[was] justified in carrying, unlimbering, loading, and aiming a gun." The State argues that the highly nuanced *Albrecht* "line of fire" analysis is "wholly inappropriate" in this case because it is limited to situations where "a criminal defendant

13

is a societally approved and highly trained gunman whose only fault was the failure to mitigate the danger of an accidental shooting." The State maintains that to adopt Perry's interpretation of *Albrecht* to form a new rule would "convert the inchoate crime of reckless endangerment into an unheard of, and fully actualized, crime of 'discharged firearm endangerment' based on hyper-technical degrees of axial danger."

The State offers *Boyer, supra,* to support its conviction that the evidence on record in the instant case was sufficient for the jury to find reckless endangerment. In *Boyer,* police responding to a domestic abuse call found the defendant in his bedroom lying partially under a bedsheet, watching television with his eleven-month old daughter. 107 Md. App. at 37. The defendant's right hand was under the covers, and, when he refused to remove it, one officer pulled the bedsheet away and discovered a machine gun, pointed directly at him, "loaded, with its 'safety' in the 'fire' position, its setting on 'SMG' (sub-machine gun), and a round of ammunition in the chamber." *Id.* at 37-38. This Court upheld three reckless endangerment convictions for endangering the two officers who were in the room and the defendant's daughter, emphasizing:

> Although appellant may not have had physical contact with the machine gun hidden beneath his bedsheet, it was in his possession and control. Also, the evidence demonstrated that, while the officers were in the bedroom, the machine gun was loaded, pointed at Officer Aquaviva, and its safety was off. Appellant and his eleven-month old daughter were inches away from the gun and appellant had his hand under the sheet, next to the gun. . . . [W]e hold that, viewing the evidence in a light most favorable to the State, a reasonable trier of fact could have reasonably concluded that appellant's conduct, when viewed objectively, was so reckless that "[it] constitute[d] a gross departure from the standard of conduct that a law-abiding person would observe and ... create[d] the substantial risk that [the reckless endangerment statute] was designed to punish."

14

*Id.* at 41-42 (quoting *Albrecht,* 336 Md. at 501). As Perry points out in his reply brief,

*Boyer* states a number of times that the gun was pointed at an officer, and that the eleven-

month old daughter was inches from the gun. *Id.* at 38, 41-42. We note however, that

despite quoting from *Albrecht*, this Court did not apply the punctilious "line of fire" or "arc

of danger" analysis in *Boyer*. Rather, the Court determined that although the daughter and

the second officer were never in the line of fire, their proximity to the unreasonably

dangerous behavior was sufficient for the jury to find that they were recklessly endangered.

*Id.* at 41-42.

Returning to the case on appeal, although there was some evidence offered at trial

that would have allowed the jury to conclude that Corporal Resh was in Perry's "line of

fire,"[4] we decline to expand *Albrecht*'s "arc of danger" analysis to the case at hand.

---

[4] Corporal Resh testified that he saw a "muzzle flash." The State argued to the jury that, if Perry had been turned away from Corporal Resh, his body would have blocked the "muzzle flash," stating:

> When that shot was fired, when he jumped the fence, his body was between, well the fence was between him and Corporal Resh. Had the gun been fired in some other direction, away from him, his body would have blocked the view of that muzzle flash. . . . When he came off that fence he had to have been in a position turned, facing Resh. Or else Resh would not have seen the muzzle flash.

The court seemed to agree with this logic, replying to one of Perry's motions for judgment of acquittal of the murder charges, after both parties had presented their case:

> Seeing a muzzle flash, the jury may well find at a minimum would indicate that the Defendant was not pointing, holding this gun if they find he fired the gun and they certainly could, at a minimum it would indicate that the gun was not pointed away from the officer in the opposite direction. They may well find that you couldn't see the muzzle flash if the man was facing 180

15

Although the "arc of danger" is a wonderfully descriptive phrase that is applicable in certain factual situations, it is not a precise substantive element of the crime of reckless endangerment.

In the context of the *Albrecht* case—the genesis of the "arc of danger" expression—the appellant was a police officer who was trained to carry and discharge a gun, and the exact line of fire was known and established. 105 Md. App. at 50. This Court was able to conduct a heightened and nuanced review of who at the scene was actually placed in substantial risk of death or serious bodily harm based on the arc of danger created by the officer's line of fire. When Officer Albrecht, a trained officer authorized to carry and use a weapon, purposefully aimed it at one precise target in broad daylight, the arc of danger was very narrow. *See id.* at 54-55.

Here, the reckless behavior that created the substantial risk was not that of a police officer, trained to discharge a weapon leveled at a specific target. Perry was a civilian who was not authorized to carry or discharge a weapon. After fleeing a traffic stop and leading three police cars on a high-speed chase on a public highway, in the middle of the dark night, Perry continued to flee franticly on foot with a loaded gun on his person. Either he was so drunk or the terrain was so rough that he fell three times. When Perry's gun fired, all that Corporal Rush (who was only yards away) could see was a muzzle flash in the dark

---

degrees away from the officer and holding the gun somewhere close to his body whereas if he was facing the officer they could see it.

Based on this evidence, a jury could reasonably find that Corporal Resh was in Perry's "line of fire" and was recklessly endangered.

16

signaling that he was in grave danger. There was no way to establish the geometric dimensions of the line of fire from the discharge of a gun held by an untrained, possibly intoxicated, person fleeing wildly from the police. Clearly, the highly nuanced "arc of danger" analysis that was applied in *Albrecht* is inapplicable to the facts presented in this case.

We hold that the jury could have reasonably found that, based on the evidence, Perry's conduct put Corporal Resh *and* Trooper Nickerson in substantial risk of death or serious physical injury sufficient to find reckless endangerment. It is clear from *Boyer* that the gun need not have fired in order to find reckless endangerment; therefore, the jury was not limited to just the isolated moment that the gun fired in making its finding of substantial risk. 107 Md. App. at 41-42. Unlike the episode in *Boyer,* here the gun *did* fire, prompting Corporal Resh to return fire, and increasing the risk of harm the officers were placed in by Perry's reckless conduct. We cannot conclude, based on the circumstances presented in this case, that not knowing the exact direction Perry's gun fired in the dark precluded a jury from finding reckless endangerment. Here, the jury was presented with sufficient evidence to find the "essential elements of the crime beyond a reasonable doubt," where the officers were within a close enough proximity to Perry's reckless behavior to be considered endangered. *Smith*, *supra,* 374 Md. at 533.

### II.     Corporal Resh's Testimony as to the Muzzle Flash

Perry argues that the circuit court erred by admitting Corporal Resh's testimony that he observed a "muzzle flash" without making determinations under Maryland Rule 5-702 required for admitting expert testimony. He contends that Corporal Resh's testimony,

17

though offered as testimony of a lay witness, was that of an expert because it was based on "his specialized knowledge, skill, expertise, and training as a law enforcement officer." Therefore, Perry argues that because Corporal Resh was not qualified as an expert, his testimony was improperly admitted.

The State counters that Perry's counsel failed to preserve this argument because she did not properly object at trial. The testimony at issue given by Corporal Resh's concerning the "muzzle flash" proceeded as follows:

[PROSECUTOR]: What, if anything, occurred next, sir?

[CPL RESH]: When [Perry] got down on the other side actually I heard a gunshot and I observed a muzzle flash.

[DEFENSE COUNSEL]: Objection.

[COURT]: You want to approach the Bench?

[DEFENSE COUNSEL]: Yes, Your Honor.

[COURT]: What's the basis of your objection?

[DEFENSE COUNSEL]: I think the characterization of the muzzle flash is for the jury to determine if it's a muzzle flash. He can describe he saw a light in conjunction with hearing a bang but I think he's calling for a conclusion.

[COURT]: A muzzle flash to me is a very descriptive.

[PROSECUTOR]: I'm going to have him explain, Your Honor. That's just, there are going to be follow up questions what a muzzle flash is. Where he's even seen one before, so forth and so on.

[COURT]: Well, I'm going to overrule the objection but you can clarify it as well.

\* \* \*

18

[PROSECUTOR]: All right, so you got on the other side of the fence. You saw a muzzle flash and heard a gunshot?

[CPL RESH]: That's correct.

[PROSECUTOR]: Tell me. What is a muzzle flash?

[CPL RESH]: A muzzle flash is actually when the primer ignites the powder in a bullet and that little minor explosion has to go somewhere so it actually goes out the end of the barrel and as a result you actually see the powder being lit off and that essentially the flash of the powder being lit.

\* \* \*

[PROSECUTOR]: Okay. You've been a trooper for 12 years now?

[CPL RESH]: Yes, sir.

[PROSECUTOR]: Have you ever trained, done any firearms training at night?

[CPL RESH]: I have.

[PROSECUTOR]: Have you ever seen muzzle flashes before this time?

[CPL RESH]: Every time. Every time we do, the state police you have to do two qualification a year. A day fire and a night fire. At a night fire every time you see muzzle flashes. When you're on the firing line that's all you see is going off to your left and right.

[PROSECUTOR]: Is there anything unique about them, I mean can they be mistaken for anything else?

[DEFENSE COUNSEL]: Objection, Your Honor.

[COURT]: Well, I will sustain the objection, the second part of the question. The first part I think is okay. Is there anything unique about it?

[PROSECUTOR]: I'll withdraw.

The State argues that defense counsel's objection to Corporal Resh's testimony was that

"it invaded the province of the jury" by making factual conclusions, not that Corporal Resh

19

was testifying as an expert. The State maintains that defense counsel's second objection during this testimony was understood by the court to have been to the compound nature of the question, not its substance.

We conclude that Perry's counsel failed to preserve the issue for appeal. Maryland Rule 8-131(a) provides that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court." Furthermore, in *Klauenberg v. State*, the Court of Appeals stated that, where an appellant states specific grounds when objecting to evidence at trial, the appellant has forfeited all other grounds for objection on appeal. 355 Md. 528, 541 (1999) (citations omitted). *See also Monk v. State*, 94 Md. App. 738, 746 (1993) ("Because appellant did indeed set forth a specific ground for his objection, we consider all other grounds—including the ground stated in appellant's brief before this court—as waived."); *Thomas v. State*, 301 Md. 294, 328 (1984) ("It is, of course, well settled that 'where specific grounds are delineated for an objection, the one objecting will be held to those grounds and will ordinarily be deemed to have waived grounds not specified.'" (quoting *Jackson v. State*, 288 Md. 191, 196 (1980))).

We agree with the State that the first objection did not challenge the witness's testimony as an expert. Indeed, as Corporal Resh continued and described his experience with muzzle flashes, seemingly at defense counsel's urging, the defense made no objection. When the court responded to the second objection indicating that it understood the objection to be to the compound nature of the question, the defense counsel expressed no dissatisfaction with the court's ruling. In other words, there is nothing in the transcript that demonstrates that the court was made aware that the defense objected to Corporal

20

Resh's testimony because it constituted impermissible expert testimony. Moreover, because counsel's objections were specific and not general, the court was not even able to hazard a guess. Therefore, we need not reach the merits to decide whether the testimony offered by Corporal Resh was actually permissible lay opinion rather than, as Perry argues, impermissible expert testimony,[5] because Perry's counsel waived the issue by failing to object at trial.

---

[5] We note that "[t]he mere fact that a witness is a law enforcement officer does not automatically transform his testimony into expert testimony." *Prince v. State*, 216 Md. App 178, 201 (2014). Indeed, Corporal Resh's testimony in this case could easily be characterized as lay opinion testimony based on his rational perception. The record does not reflect that he was specifically trained to recognize a "muzzle flash;" rather he testified that, because of his job he has been exposed to "muzzle flashes" a number of times, much like the officers identifying the smell of marijuana in *In re Ondrel M*. 173 Md. App. 223 (2007). In that case, this Court determined that an officer could properly testify as a lay witness about smelling marijuana at the scene. *Id.* at 244. We quoted with approval the following language from a Texas case, *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002):

> There are certain fields where a witness may qualify as an expert based upon experience and training, **however, use of the terms "training" and "experience" do not automatically make someone an expert.** All opinions are formed by evaluating facts based on life experiences including education, background, training, occupation, etc. **While [the police officer] may have had the potential to be qualified as an expert because she possessed knowledge, skill, experience and education, she was not testifying as an expert when she identified the marihuana. Rather, she was testifying based on her firsthand sensory experiences.** [The police officer] herself smelled the odor that she perceived to be burnt marihuana. The fact that she had smelled marihuana before in *the course of her employment as a police officer does not necessarily make her an expert. And, again, even if she was an expert, that would not preclude her from offering a lay opinion about something she personally perceived.*

*Id.* at 244-45 (bold emphasis supplied; italics emphasis in original) (quoting *Osbourn,* 92 S.W.3d at 538–39). We concluded in *In re Ondrel M.*, that the fact that the officer "based his opinion regarding the odor of marijuana on his prior training and experience as a police

Perry presses in his reply brief that we should conduct plain error review. This Court has previously stated that plain error review is a "'rare, rare phenomenon,' undertaken only when the un-objected-to error is extraordinary." *Pickett v. State*, 222 Md. App. 322, 342 (2015) (declining to undertake plain error review where the appellant initially stipulated to the admission of the evidence and the State's limited questioning was at the request of the appellant) (quoting *Kelly v. State*, 195 Md. App. 403, 432 (2010)). Plain error review can be conducted where (1) there is an error that the defendant did not affirmatively waive, (2) the error is "'clear and obvious,' *i.e.*, not subject to reasonable dispute," and (3) the error affected the outcome of the trial, and, therefore, is material. *Steward v. State*, 218 Md. App. 550, 565-66 (2014) (citing *Kelly*, 195 Md. App. at 432).

Corporal Resh's testimony in this case as to the "muzzle flash" does not rise to the level of error required for plain error review. Not only is the error not "clear and obvious," but the error was not material for the reason that even if he couldn't use the word "muzzle flash," Corporal Resh could have testified that he saw a flash of light in conjunction with the gunshot. This testimony would have allowed the jury to infer, in the same manner they may have based on hearing "muzzle flash," that the gun was shot in Corporal Resh's direction. It did not require an expert, nor advanced knowledge in physics, for the jury to have concluded that the light travelled straight ahead and did not bend around Perry's body. Therefore, plain error review is not warranted.

---

officer [did] not render the opinion, *ipso facto,* an expert opinion." *Id.* at 245. Because the officer's opinion was based on his personal perception of the odor that he smelled it was properly lay opinion testimony. *Id.*

### III.    Jury Coercion

Perry contends that the circuit court impermissibly coerced the jury by informing the jurors that the case would conclude in two days or less.  Perry argues that the court's comments "signaled to the jury that its deliberations could not follow the natural course, but rather must be completed on the trial court's arbitrary and artificial timetable."

The State in riposte argues that (1) Perry did not make this objection at trial, therefore it is not preserved, (2) plain error review should not be applied to reach the merits of this claim, and (3) the claim is unmeritorious as the Judge's comments merely informed the jurors of the anticipated running time of trial.

The transcripts reflect that the following exchange occurred between the court and potential jurors:

> [COURT]: [I]t's anticipated that this case may take two days to complete.  Is there anything about the anticipated length of the trial that might cause any of your [sic] any problem in serving on this jury[?]  If so please stand up and give us your number.

During voir dire of the potential jurors, the court stated:

> [COURT]: [T]he length of the trial.  How might that pose a difficulty for you?
>
> [JUROR]: When I got my notice I get off the 30th and 31st which I requested and received.  But last week my plans changed and I needed off the 23rd and 24th.  I faxed them last Thursday and told them I would be available the 30th and 31st but not the 23rd and 24th and I haven't responded, they have not responded.  So I gave it to the Clerk when I came in and she said to see her afterwards.
>
> [COURT]: So you're saying tomorrow is a problem for you?
>
> [JUROR 1]: No, no, no, not tomorrow. I thought you said anytime would two days be a problem. No.

23

[COURT]: Well this case is expected to last two days meaning today and tomorrow.

[JUROR 1]: Right.

[COURT]: So you're all right with these two days?

[JUROR 1]: With these two days, yes.

[COURT]: All right. Well then that's not likely to be a problem. . . .

\* \* \*

[COURT]: You also expressed some concern about the length of the trial. How is that an issue for you?

[JUROR 2]: I don't know if you're planning on doing the trial like tomorrow and Friday, but Friday. . .

[COURT]: No, it's today and tomorrow.

[JUROR 2]: Today and tomorrow. As long as it doesn't go into Friday I'm fine.

[COURT]: I think we're in pretty good shape on that.

[JUROR 2]: You're like positive that it won't go into Friday? Because I, I. . .

[COURT]: That's what they tell me. I'm basing it on what the lawyers tell me.

[JUROR 2]: Okay, I have to take my state boards on Friday morning so I can't miss that. . . .

[COURT] We'll hold them to it.

\* \* \*

[JUROR 3]: . . . My main issue today is this Friday morning my wife has her appendix removed. . .

[COURT]: Well the attorneys have assured me we are going to finish this case tomorrow. . .

On the second day of trial, when dismissing the jury for lunch, the court stated:

[COURT]: . . . It's about 12:15. It's going to take us a few minutes so I'll give you until 1:30. Now, let me admonish you of what I try to tell you each time we take a recess, but it's particularly important when you leave the courthouse that once again, do not have any contact with anybody associated with this case, the witness, the parties, the lawyers, etcetera. . . .Don't talk to anyone about this case. . . .You'll have plenty of time to do that when you heard everything. This case is going to conclude this afternoon so you'll have opportunities to talk with one another then. So with that in mind, I'll excuse the jury till 1:30.

The record does not reflect that defense counsel objected or that the issue was raised below, and so we agree with the State that the issue is not preserved for appeal. *See Heineman v. Bright*, 140 Md. App. 658, 671 (2001) (citing Maryland Rule 8-131 for the premise that the Court of Special Appeals ordinarily will not decide any "non-jurisdictional issue unless the issue plainly appears by the record to have been raised in or decided by the trial court") (citing *Acquah v. State*, 113 Md. App. 29, 43 (1996); *see also Lohss v. State*, 272 Md. 113, 119 (1974), *superseded on other grounds by State v. Rush*, 174 Md. App. 259 (2008) ("[W]hen a party has the option of objecting, his failure to do so while it is still within the power of the trial court to correct the error is regarded as a waiver estopping him from obtaining a review of the point or question on appeal.") (citations omitted).

It is evident from the court's statements made during the *voir dire* of potential jurors that the court was informing the jury as to how long the evidence and arguments would take, *based on the timeline given to the court by the attorneys*, in order to determine if any juror had a conflict. There is no evidence that the court was imposing a deadline for a jury

25

decision. Furthermore, when the court stated during the trial that the trial was going to conclude that afternoon, it was in the context of admonishing the jurors not to discuss the case during lunch and informing them that they would finally be able to deliberate that afternoon, after the conclusion of the evidentiary phase of the trial. There is no evidence that the court was pressuring the jury to come to a decision within a specified amount of time. And, because Perry's counsel made no objections, there was no opportunity for the court to *voir dire* the jury to determine whether they felt coerced by these statements. There is simply nothing in the record that would support a finding of coercion in this case. As the State points out, it would be unreasonable to restrict a court from informing a jury about the anticipated length of the evidentiary phase of the trial.

## IV. Merger of Negligent Driving and Reckless Driving Convictions

Finally, Perry argues that because negligent driving is a "lesser included offense" of reckless driving, that conviction should be merged into his conviction for reckless driving and his negligent driving conviction should be vacated.[6] The State agrees that Perry's sentence for negligent driving should be merged with his sentence for reckless driving. However, the State disagrees that the *convictions* should be merged, arguing that "the double-jeopardy protection against multiple punishment for the same offense within

---

[6] Perry may properly appeal his convictions for negligent driving and reckless driving even though the circuit court suspended the fines for these convictions. Under Maryland Code (1973, Repl. Vol. 2013), Courts and Judicial Proceedings Article ("CJP"), § 12-301, "[i]n a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended." *See also Pearlman v. State*, 226 Md. 67, 71 (1961) ("[I]n a criminal case there is an appeal from any judgment and from any conviction where sentence has been suspended.").

the context of a single prosecution is not the same as the double-jeopardy plea in bar against successive prosecutions for the same offense . . . ." In his reply brief, Perry acknowledges that under *Moore v. State*, 198 Md. App. 655 (2011), cited by the State, only sentences are merged under these circumstances. Perry asks this Court to either vacate his conviction for negligent driving or, alternatively, his sentence for negligent driving.

In Maryland, negligent driving is a lesser included offense of reckless driving. *Jones v. State*, 175 Md. App. 58, 89 (2007). In *Jones*, this Court vacated the fines for the conviction of negligent driving, stating:

> We agree with appellant that the offenses of negligent driving and reckless driving are the same for double jeopardy purposes. We think that it "splits hairs" to conclude anything other than that negligent driving, *i.e.*, driving in a careless or imprudent manner that endangers property or the life or person of any individual, is a lesser included offense of reckless driving, *i.e.*, driving with a wanton or willful disregard for the safety of persons *or* property.

*Id.* (citation omitted).

It is clear that when lesser included offenses merge into the greater offense, the convictions stand while the sentence for the lesser included offense is vacated. *Moore*, 198 Md. App. at 692. In *Moore*, this Court explained:

> When a defendant is convicted of a greater inclusive offense, double jeopardy considerations protect him from being punished for a lesser included offense. . . . It is not literally appropriate to acquit the defendant of the lesser offenses, for it is the indisputed fact that he has perpetrated each and every element of those lesser included offenses. . . . Most of our conceptual problems are eliminated when we appreciate that the very notion of merger is something designed simply to avoid multiple punishment.

*Id.* at 689-90 (emphasis omitted) (quoting Richard P. Gilbert & Charles E. Moylan, Jr., *Maryland Criminal Law; Practice and Procedure*, 452-53 (1983)). Accordingly, we hold

27

that Perry's negligent driving conviction stands, but merges with his reckless driving conviction for the purpose of sentencing only.

**JUDGMENTS OF CONVICTION BY THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED; SENTENCE FOR NEGLIGENT DRIVING VACATED; COSTS TO BE PAID 2/3 BY APPELLANT AND 1/3 BY TALBOT COUNTY.**